## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| ROBERT HOWIE, derivatively on behalf of CAMBER ENERGY INC.,<br><br>                              Plaintiff,<br><br>v.<br><br>JAMES A. DORIS, FRANK W. BARKER, JR., FRED S. ZEIDMAN, JAMES G. MILLER, ROBERT GREEN, LOUIS G. SCHOTT, ROBERT SCHLEIZER, DISCOVER GROWTH FUND LLC and JOHN C. KIRKLAND,<br><br>                              Defendants,<br><br>CAMBER ENERGY, INC.,<br><br>                    Nominal Defendant. | **CASE NO. 4:22-cv-2167**<br><br><br>**JURY TRIAL DEMANDED**<br><br><br>**SHAREHOLDER DERIVATIVE ACTION** |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Robert Howie ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant Camber Energy, Inc. ("Camber" or the "Company"), files this Shareholder Derivative Complaint against Defendants James A. Doris, Frank W. Barker, Jr., Fred S. Zeidman, James G. Miller, Robert Green, Louis G. Schott and Robert Schleizer (collectively, the "Individual Defendants") and Discover Growth Fund LLC, and John Kirkland (the "Discover Defendants") for violation of federal securities laws, breaches of Camber directors and officers fiduciary duties, unjust enrichment, aiding and abetting of fiduciary breaches by the Discover Defendants and waste of corporate assets.

Plaintiff alleges the following against the Defendants based upon personal knowledge as to himself and his acts, and information and belief as to all other matters, based upon, *inter alia*,

the investigation conducted by and through his attorneys, which included, among other things, a review of the public documents, transcripts of conference calls and announcements made by Camber, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by, and regarding, Camber, news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, and public filings in actions between Camber and Discover Fund in 2016 and 2022 (*Camber Energy, Inc. v. Discover Growth Fund*, No. H-17-1436 (U.S.D.C. SDTX); *Discover Growth Fund LLC v. Camber Energy, Inc.*, 22-civ-00755 (S.D. TX) and the related federal securities class action lawsuit action filed in the United States District Court for the Southern District of Texas Houston Division, captioned *Coggins v. Camber Energy, Inc., et al.* 4:21-cv-03574 (the "Securities Action"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Camber against certain of its officers and directors and the Discover Defendants for aiding and abetting thereof seeking to remedy the Individual Defendants' violations of the federal securities laws arising out of director solicitation of votes from Camber shareholders through materially false and misleading Proxy Statements to obtain shareholder approval, *inter alia*, for financing transactions with the Discover Fund to, *inter* alia, facilitate the acquisition of Viking. It also seeks to hold directors Defendants responsible for waste of corporate assets and breach of fiduciary duties in connection with the issuance of the Series C stock to Discover Fund and the purchase of equity of Viking Energy Group, Inc. After December 20, 2020, Defendant Doris (a dual director

of Camber and Viking) directed Camber into purchases of Viking equity at inflated prices. This action also seeks to hold the Discover Defendants' violation of federal securities law in connection with the purchase and/or sale of Camber securities.

2.  Each of Camber's current directors engaged in self-dealing and/or faces a substantial likelihood of unexculpated personal liability and each is therefore incapable of fairly considering a shareholder demand. Demand is therefore futile and under Delaware law, futile.

3.  Camber was a failing, cash strapped oil producer posing as a "growth-oriented, diversified energy company" and which claims to provide "custom energy & power solutions to commercial and industrial clients in North America and owns interests in oil and natural gas assets in the United States." See https://www.camber.energy/about (visited on March 8, 2022).  In reality, in 2017 and continuously thereafter, Camber was so desperate for cash that it turned to Discover Growth Fund for financing (whose principals' other financing companies' activities were subject of SEC enforcement proceedings for securities laws violation in connection with financing schemes similar to those with Camber). Camber' Board agreed to Discover Growth Fund's terms for financing by issuing to Discovery a Series C convertible stock. Camber's directors later admitted in judicial proceedings they did not understand and could not interpret the terms of the financing. Camber was exposed to and suffered risk of massive dilution of Camber shareholders' equity and voting power. Camber later alleged in its lawsuit that Discovery Fund manipulated Camber stock price downward using the Series C conversion terms to profit from a short selling and conversion scheme. Those allegations were similar to those alleged against other finance companies controlled by Discover Funds principals' as reflected in an SEC enforcement action.

4.  Camber was forced to settle its action against Discover Fund in favor of Discover Fund. Nonetheless, Camber's directors continued to enter into Series C financing deals with

Discover for, *inter alia*, financing for the Viking acquisition which was finalized under the direction of Doris who holds dual positions as Camber director and Viking CEO. At all relevant times, Doris was a major shareholder of Viking and profited from Camber's purchase of Viking equity.

5.     The conversion of Series C stock to common stock materially increased Camber's outstanding shares. The SEC mandates disclosure of the number of shares outstanding in all quarterly and annual financial statements. In addition, if the number of issuer shares outstanding increases by more than 5% during any period between the issuer's filing of its financial statements, including through the conversion of securities into common stock, the issuer must file a Form 8-K announcing the dilution. Camber's directors never caused Camber to file any 8-Ks providing a true and accurate account of Camber's outstanding shares of common stock.

6.     In February 2020, Camber announced it was pursuing a reverse merger with Viking Energy, Inc. ("Viking). While Camber was the surviving entity, the reverse merger would leave Viking shareholders with a substantial majority of its shares.

7.     From the time of the announcement, Camber's executives *de facto* relinquished control to Viking's CEO, Defendant Doris.

8.     In February 2020, using monies raised through a Series C financing deal with Discover Fund, Camber loaned Viking $5,000,000 as a condition of Caber entering into a merger agreement with Viking which at the time was a barely solvent company in poor financial condition.

9.     Camber and Viking have not been able to consummate the merger in full because, *inter* alia, Camber has been unable to complete and file periodic financial statements with the SEC as required by law. Camber could have abandoned the Viking merger but instead Camber

purchased went ahead with a purchase of a 51% interest in Viking Energy Group, Inc., for $20,100,000, payable through the cancelation of $9.2 million of existing debt owed by Viking to Camber, and payment of $10.9 million in cash, (the "51% Acquisition"). Part of the deal involved Doris being installed as CEO.

10.     The ill-conceived 51% Acquisition and Camber's subsequent follow-on purchases of Viking equity in early 2021 after Defendant Doris became CEO of Camber and was a director of both Viking and Camber, were a self-dealing transaction to benefit Doris and were a waste of corporate assets and have been a disaster for Camber, resulting in little to no synergies, goodwill, shareholder value or other tangible benefits.  Indeed, the core Viking assets were not worth anywhere near what Camber agreed to pay and were low-quality and dangerously levered. Viking had never achieved consistent GAAP profitability.  From 2015 to 2021, Viking's cumulative net income totaled negative $105 million. At the time of Camber purchases of equity, Viking was at risk of being, or in fact was, insolvent.

11.     Because of the Defendants' misfeasance and malfeasance, Camber has been unable to make timely filings of its quarterly and annual financial statements with the Securities and Exchange Commission (the "SEC") without excuse or justification.

12.     The Series C financings are the reason for the massive dilution of Camber equity. Camber was forced to settle a 2022 lawsuit by Discover Fund alleging that Camber's failure to make SEC filings was a default of their agreements by immediately issuing Camber common stock to Discover Fund thus further diluting Camber.

13.     Throughout the Relevant Period, the Individual Defendants used false and misleading proxy statements to solicit votes from shareholders approving Stock Purchase

Agreements with Discover Fund and stock issuance in order to, *inter alia*, finance the acquisition of Viking equity.

14.     Specifically, the Proxy Statements and other SEC filings which are the subject of this action contained false and/or misleading statements and/or failed to disclose: (i) that the Company was not following proper accounting for its number of shares outstanding as a result of sale and issuance of Series C shares thereby misstating Camber's financial condition and concealing from voting shareholders accurate per share amounts of earnings and stockholder equity as well as the extent of the massive dilution of Camber's voting and economic equity; (ii) after October 2020, the fact that in October 2020, Camber was notified by the SEC in an SEC Comment Letter that its accounting for Series C stock was incorrect and would require restatement of Camber's financial statements and as a result, the Company's reported financial results and public statements were materially false and misleading at all relevant times; (iii) Defendants concealed the fact that the Discovery Fund's principals were also principals of another company being prosecuted by the SEC for securities laws violations in connection with the same type of financing as extended to Camber which resulted in $4 million in sanctions; (iv) Camber overstated the financial and business prospects of Viking as well as the combined company post-Merger; (v) Camber failed to apprise investors of, and/or downplayed, the fact that its acquisition of a controlling interest in Viking would exacerbate the Company's delinquent financial statements and listing obligations with the NYSE; (vi) the fact that the financing with Discover Fund would put Camber at risk of being the victim of a short-selling and conversion strategy that would continuously depress Camber's stock price and preclude re-listing of Camber on any exchange; and (vii) the true reason why Camber was unable to timely file its periodic financial reports with the SEC.

15.     In total, Camber took tens of millions of dollars of funding from Discover in 2020 and 2021, through sales of Series C convertible shares. Almost all of said proceeds were immediately transferred to Viking in economically meaningless purchases of Viking shares or through loans to Viking that were forgiven may never be required.

16.     By September 2020, Camber had literally run out of authorized shares to issue to Discover. It needed its shareholders to vote to authorize an increase in its maximum issuable shares from 25 million to 250 million. Camber thereafter solicited shareholders vote in favor of increasing Camber's authorized shares on additional occasions. The shareholders  approved the authorization in February 2021.

17.     By February 2021, Discover held thousands of dilutive convertible Camber securities, each of which could be converted into tens of thousands of Camber common shares. Discover had planned to convert its convertible securities into hundreds of millions of common shares and then sell them for nine-figure profits.

18.     Discover was able to effect some conversions and sales before June 2021. But on May 21, 2021, Camber became delinquent on its SEC filings, a delinquency it has not remedied to the date of this filing. That delinquency kept Discover from obtained registered, or registration exempt, common stock from Camber.

19.     The common shares Discover obtained upon conversion were not registered. They could only be sold lawfully if registered or under an exemption from the registration requirements. While Discover purported to rely on a provision set out in SEC Rule 144, that provision is not available if the issuer is delinquent in its SEC filings. Thus, Discover could not legally sell any Camber common stock it obtained upon conversion after May 21, 2021, when Camber became delinquent.

20.     Camber's officers and directors however allowed Discovery to sell unregistered shares.

21.     Some of these issues were eventually brought to Camber's investors' attention by a third party. On October 5, 2021, Kerrisdale Capital ("Kerrisdale") released a report ("Kerrisdale Report") which revealed that the "market is badly mistaken about Camber's share count and ignorant of [Camber's] terrifying capital structure," estimating the Company's "fully diluted share count is roughly triple the widely reported number." On that news, Camber's share price fell 50%  understandably as the investing public learned that each of Camber's outstanding shares were worth 65% less than was implied by Camber's materially misleading publicly reported share count.

22.     Shortly thereafter, Camber made a series of admissions of previously concealed information concerning its share count outstanding and SEC inquiries into Camber's accounting for its convertible stock.

23.     In March 2022, Camber disavowed all of its publicly filed financial statements from 2017 to date and warned investors and shareholders not to rely thereon for any purpose.

24.     As demonstrated by the well pleaded factual allegations herein, the Individual Defendants' knowingly or recklessly breached federal securities laws and fiduciary duties and engaged in other misconduct that substantially damaged the Company.

25.     The individual defendants' interests were never aligned with Camber or the non-Discover shareholders inasmuch as, according to Camber's November 2021 Amended 10-KA, none of the directors hold any Camber stock.

26.     Doris and Discover reaped massive profits. The Discover Defendants who committed securities fraud and aided and abetted Camber directors fiduciary breaches and proxy

violations made nine-figure profits from illegally selling converted Camber shares. In 2021, Discover and an affiliated fund provided or contracted to provide Camber with $143.5 million in new funding despite Camber having no significant operations.

27.     But unsuspecting investors paid the price. On October 5, 2021, an analyst released a report revealing that Camber's fully diluted capital stock likely exceeded 250 million shares. On October 6, 2021, Camber revealed that it had 249.6 million shares issued and outstanding.

28.     Camber's stock price fell 70.6% between its closing on October 4, 2021, and its closing on October 6, 2021, a plain result of the disclosure of the previously concealed fraud.

29.     A majority of the Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence because there is a substantial likelihood that a majority of the Company's current directors are personally liable in this derivative action and the Securities Litigation for unexculpated breaches of fiduciary duty and securities laws violations.

## II.

## JURISDICTION AND VENUE

30.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

31.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

32.     This Court has jurisdiction over each defendant named herein because each is either a corporation that conducts business in and maintains operations in this District, is an

individual residing in this District, and/or is an individual non-resident who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

33.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Camber maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**III.**

**PARTIES**

**A.  Plaintiff**

34.     Plaintiff is a shareholder of Camber common stock. Plaintiff has continuously held Camber common stock during the relevant period.

**B.  Nominal Defendant**

35.     Nominal Defendant, Camber is a Nevada corporation with principal executive offices located at 15915 Katy Freeway, Suite 450, Houston, Texas 77094.

36.     Camber shares trade on the NYSE under the ticker symbol "CEI."

**Camber's Current Board**

37.     Defendants Doris, Zeidman, Miller and Green constitute Camber's Board of Directors at present.

## C.  Current Directors And Officers

### 1.  Defendant Doris

38.      Defendant James A. Doris ("Doris") was from December 2020 the Company's Chief Executive Officer ("CEO") and Chairman of the Board. The Company filed a Form 10-K with the SEC on November 18, 2021 (the "Form 10-K-A"), which stated the following regarding Defendant Doris:

> Mr. Doris was appointed as Chief Executive Officer and Chairman of the Board of Directors for the Company on December 23, 2020 in conjunction with the acquisition of Viking by the Company.  He has been an officer and director of the Viking Energy Group, Inc. since 2014 and has been an integral part of transitioning the Company to an appropriate platform to facilitate growth.

39.      During the period relevant to the claims herein, Doris was employed by and paid by both Camber and Viking.

40.      Defendant Doris caused Camber to issue a materially false and misleading Proxy Statement dated January 8, 2021 and December 2021.

### 2.  Defendant Barker

41.      Defendant Frank W. Barker ("Barker") is at all relevant times Company's Chief Financial Officer ("CFO") (2020-Present and has been Viking's CFO since December 2017). The Company's Form 10-K-A stated the following regarding Defendant Barker:

> Mr. Barker was appointed as Chief Financial Officer for the Company on December 23, 2020 in conjunction with the acquisition of Viking by the Company. Mr. Barker is a Certified Public Accountant licensed to practice in the State of Florida.  Mr. Barker has been providing professional services to Viking Energy Group, Inc. since the beginning of 2015.  On December 29, 2017, Mr. Barker accepted the position as Chief Financial Officer of Viking Energy Group, Inc.

42.      During the period relevant to the claims herein, Barker was employed by and paid by both Camber and Viking.

43.     Defendant Barker's duties included ensuring the accuracy of Camber's reported financial results, including Camber's share count and complying with disclosure obligations.

### 3.  **Defendant Zeidman**

44.     Defendant Fred S. Zeidman ("Zeidman") was at relevant times a director of Camber (from June 24, 2013).   In addition, Defendant Zeidman is a member of the Audit Committee. The Audit Committee members had responsibility for the accuracy of Camber's SEC filings. Zeidman was paid fees for his service to Camber as a director.

45.     Defendant Zeidman caused Camber to issue materially false and misleading Proxy Statements dated: November 29, 2017; January 9, 2019; March 3, 2020 and January 8, 2021 and December 2021.

### 4.  **Defendant Miller**

46.     Defendant James A. Miller ("Miller") was at relevant times a director of Camber since July 10, 2018 to the present. In addition, Defendant Miller was and is Chairman of the Audit Committee. The Audit Committee members had responsibility for the accuracy of Camber's SEC filings. According to Form 10-K, for the fiscal year ended March 31, 2020, Defendant Miller received $53,333 in fees earned.

47.     Defendant Miller caused Camber to issue materially false and misleading Proxy Statements dated January 19, 2019, March 3, 2020, January 8, 2021 and December 2021.

### 5.  **Defendant Green**

48.     Defendant Robert Green ("Green") joined Camber's Board on December 23, 2020. He was appointed on the same day Camber acquired a majority interest in Viking shortly after Doris was made CEO of Camber.

49.     Defendant Green caused Camber to issue materially false and misleading Proxy Statements dated January 8, 2021 and December 2021.

### D.  Former Directors

#### 1.  Defendant Schott

50.     Defendant Louis G. Schott was at relevant times a director of Camber from February 19, 2019 until January 18, 2021. From May 25, 2018 he was Camber's Interim Chief Executive Officer until replaced by Defendant Doris in December 2020. Under Schott's reign, Camber entered into several Series C financing arrangements.

51.     Defendant Schmitt caused Camber to issue materially false and misleading Proxy Statements dated January 9, 2019 and March 3, 2020.

#### 2.  Defendant Schleizer

52.     Defendant Robert Schleizer is and/or was Camber's Chief Financial Officer, Interim Principal Financial Officer, Treasurer and a director of Camber since June 2, 2017. Schleizer resigned from his positions as director and officer of Camber on December 23, 2020.

53.     Defendant Schleizer caused Camber to issue materially false and misleading Proxy Statements dated November 29, 2017, January 9, 2019 and March 3, 2020.

54.     Schleizer is the Managing Partner of Blackbriar Advisers LLC which provides financial management, accounting, treasury, administrative and financial reporting services to Camber for which it was paid $485,000 in 2020 and $713,000 in 2019.

### E.  The Discover Fund Defendants

#### 1.  Discover Growth Fund LLC

55.     Based in St. Thomas, V.I., Defendant Discover Growth Fund, LLC ("Discover") is a fund managed and wholly owned by Defendant Discover Fund Management LLLP ("DFM

LLLP"). Discover provides financing to microcap and nanocap public companies,  usually in exchange for securities that can be converted into a fixed dollar amount of common shares.

### 2.  John C. Kirkland

56.     Defendant John C. Kirkland ("Kirkland") is the sole member of Discover and the general partner  of DFM LLLP. Kirkland  described himself in a declaration  under penalty of perjury as, *inter alia*, a practicing securities attorney for more than 20 years who has handled billions of dollars in public offerings and private placements of debt and equity securities.

57.     Discover and Kirkland are the "Discover Defendants".

58.     At all relevant times, Kirkland also controlled an entity named Antilles Family Office, LLC ("Antilles"). Discover and nonparty Antilles share a Treasurer (nonparty Sheniqua Rouse-Pierre), and Kirkland holds voting control over both Discover's and Antilles' shares. John Kirkland  verified  a complaint  that Antilles  filed. *Antilles Family  Office,  LLC,  v. Inception Mining, Inc.,* 21-cv-1822-CFC,  Dkt. #1, at 16 (D. Del. Dec. 27, 2021). Antilles paid the attorneys' fees in the bankruptcy  referenced in 33. Since July 2018, nonparty John  Burke  has  conducted both  Discover  and  Antilles's  securities  trading. *Discover Growth Fund v.  Camber Energy, Inc.,* 22-cv-755, Dkt. # 17-3, 4 (S.D. Tex. 2022). Kirkland conducted transactions with Camber through Antilles which were injurious to Camber as more fully set forth herein.

### IV.

### THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

### A.  Statutory And Common Law Duties

59.      By reason of their positions as officers, directors and/or fiduciaries of Camber and because of their ability to control the business and corporate affairs of Camber, the Individual Defendants owed Camber and its shareholders' fiduciary obligations of trust, loyalty, good faith,

and due care. The Individual Defendants were and are required to use their utmost ability to control and manage Camber in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Camber and its shareholders to benefit all shareholders equitably.

60.     Each director and officer of the Company owes Camber and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

61.     As fiduciaries of Camber, The Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

62.     The officers and directors of Camber were required to exercise loyal, reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

63.     Each Individual Defendant, under his or her position as a director and/or officer, owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, candor to shareholders and diligence in the management and administration of the affairs of the Company. As Camber's directors and officers, the Individual Defendants knowingly acted in their self-interest and/or gross negligent or with reckless disregard of their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

64.     The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, inter alia, the Company's outstanding share count, interactions with regulators such as the SEC financial condition, business operations, management, performance, growth, earnings, and business prospect. Moreover, as senior executive officers and directors of a publicly traded company whose common

stock was registered with the SEC, pursuant to the Exchange Act, Individual Defendants had a duty to act in the best interest of the Company. As fiduciaries, the Individual Defendants had duties under securities laws and by virtue of directors' fiduciary duties to Camber shareholders in connection with recommending to shareholders how to vote on proposals included in Proxy Statements and to disclose in its regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

66.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties.

66.     Each of the Individual Defendants further owed Camber's and the shareholders the duty of loyalty requiring that each favor Camber's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

67.     At all times relevant hereto, the Individual Defendants were the agents of each other and Camber and were at all times acting within the course and scope of such agency.

68.     The Individual Defendants had access to adverse, non-public information about the Company because of their advisory, executive, managerial, and directorial position with Camber.

69.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Camber.

70.     Camber's directors are so indifferent to their director duties that they have not updated Camber's Code of Conduct and Audit Committee charters since 2016 and on Camber's website those documents still refer to "Lucas Energy" not Camber.

### B.     Camber's Code of Conduct

71.     The Individual Defendants, as officers and/or directors of Camber, were bound by the Company's Code of Ethics (the "Code"). Camber purports to take disciplinary action in the event an employee is in violation of the Code. However, its directors have never taken any such action. The Code states in pertinent part:

> Employees and members of the Board should strive to identify and raise potential issues before they lead to problems and should ask about the application of this Code whenever in doubt. Any employee or member of the Board who becomes aware of any existing or potential violation of this Code should promptly notify a Company Officer or contact the Chairman of the Nominating & Corporate Governance Committee (the "Outside Director").

> The Company will take such disciplinary or preventive action as it deems appropriate to address any existing or potential violation of this Code brought to its attention.

> Any questions relating to how these policies should be interpreted or applied should be addressed to a Company Officer or contact the Outside Director.

72.     The Code outlines the importance of accurate financial disclosures and record keeping. Notably, it states:

> **General**

> It is the Company's policy that the information in its public communications, including Securities and Exchange Commission filings, be full, fair, accurate, timely, understandable and in the best interest of the Company and its shareholders. All employees and members of the Board who are involved in the Company's disclosure process are responsible for acting in furtherance of this policy. In particular, these individuals are required to maintain familiarity with the disclosure requirements applicable to the Company and are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about the Company to others, whether within or outside the Company, including the Company's independent auditors. In addition, any employee or member of the

Board who has a supervisory role in the Company's disclosure process has an obligation to discharge his or her responsibilities diligently. Please note that management will determine the types of information that must be disclosed and the timing of such disclosures.

## Financial Reporting

The integrity of the Company's financial records and reports is essential; stockholders, potential investors, regulatory agencies, lending institutions and others depend on the accuracy of such information. It is the Company's policy to fully, accurately, timely and fairly report all financial transactions in the accounting records of the Company and in the Company's published financial reports. Further, the financial statements must fairly present the financial position and results of operations of the Company, in all material respects, in accordance with Generally Accepted Accounting Principles. The Company strictly prohibits you from engaging in any actions, omissions or practices, whether intentional or reckless, that would result in rendering the Company's financial statements materially inaccurate or misleading. In addition, the Company further prohibits you from engaging in any actions, omissions or practices, whether intentional or reckless, that circumvent the Company's established internal and/or disclosure controls. Every individual involved in creating, transmitting or entering information into the Company's financial and operational records is responsible for doing so fully, accurately, and with appropriate supporting documentation. You may not make any entry that intentionally hides or disguises the true nature of any transaction. For example, you may not understate or overstate known liabilities and assets, defer or accelerate the proper period for recording items that should be expensed, or falsify quality or safety results.

Knowingly entering inaccurate or fraudulent information, or failing to enter material information, into the Company's accounting system is unacceptable and may be illegal. If you know that an entry or process is false, you are expected to inform your supervisor or department head, or, if necessary, a Company Officer or the Chairman of the Audit Committee (the "Audit Chair"). In addition, it is your responsibility to give your full cooperation to the Company's authorized internal and independent auditors.

***

The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions. For example, only the true and actual number of hours worked should be reported.

Business expense accounts used by employees must be documented and recorded accurately. If you are not sure whether a certain expense is legitimate, please refer to the rules and guidelines in the Company's travel and entertainment policy in the Company's employee handbook. All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to

applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable law or regulation and approved in writing by the CEO. Business records and communications often become public, and we should avoid exaggeration, derogatory remarks, guesswork, or inappropriate characterizations of people and companies that could be misunderstood. This applies equally to e-mail, internal memos, and formal reports. (**ALWAYS ASSUME YOUR E-MAIL, MEMO, ETC. WILL BE PRINTED IN THE WSJ...WILL IT PASS "THE NEWSPAPER TEST"?**) Records should always be retained or destroyed according to the Company's record retention policies. In accordance with those policies, in the event of litigation or governmental investigation, threatened or known, please consult with a Company Officer or the Audit Chair.

73.     The Code outlines the importance of accurate record keeping. It states in pertinent part:

Transparency is a critical element of trust. That need for transparency is absolute in all company documents – with employees, customers, and our financial books and records. It is our policy to make full, fair, accurate, timely and understandable disclosure in compliance with all applicable laws and regulations in all reports and documents that the Company files with, or submits to, the Securities and Exchange Commission and in all other public communications made by the Company.

All employees must complete all Company documents accurately, truthfully, and in a timely manner, including all travel and expense reports. When applicable, documents must be properly authorized. You must record the Company's financial activities in compliance with all applicable laws and accounting practices. The making of false or misleading entries, records or documentation is strictly prohibited. You must never create a false or misleading report or make a payment or establish an account on behalf of the Company with the understanding that any part of the payment or account is to be used for a purpose other than as described by the supporting documents.

## C.     **Camber's Audit Committee Charter**

74.     In addition to the above duties, the Defendants Zeidman who served on the Audit Committee during the Relevant Period owed specific duties to Camber under the Audit Committee Charter (the "Audit Charter"). The Audit Charter set forth the following responsibilities of the Audit Committee Defendants:

The Committee believes its policies and procedures should remain flexible in order to react more effectively to changing conditions and to ensure that the corporate

accounting and reporting practices of the Company are in accordance with all requirements and are of the highest quality. In carrying out these responsibilities, the Committee will:

- Meet with the independent auditor and financial management of the Company to review the scope, planning and staffing of any audit and review the audit procedures to be utilized.

- Review and discuss with management and the independent auditor (a) significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including the effects of alternative GAAP methods on the financial statements, (b) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, (c) material issues on which the audit team consulted the independent auditor's national office, (d) accounting adjustments that were noted or proposed by the independent auditor but were "passed" (as immaterial or otherwise), and (d) any management or internal control letter issued, or proposed to be issued, by the independent auditor to the Company.

- Review with the independent auditor, the Company's financial personnel and the Company's accounting personnel, the adequacy and effectiveness of the accounting and financial controls of the Company and any special audit steps adopted in light of any material control deficiencies and any fraud involving management or other employees with a significant role in such controls, and elicit any recommendations for the improvement of such internal control procedures or particular functions where new or more detailed controls or procedures are desirable.

- Review and discuss with management and the independent auditor the annual audited financial statements (including the related notes), the form of the audit opinion to be issued by the independent auditor on such financial statements and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's annual report on Form 10-K and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

- Review and discuss with management, the internal auditor and the independent auditor management's annual internal control report and the independent auditor's attestation of the report prior to the filing of the Company's Form 10-K.

- Review an analysis prepared by management and the independent auditor of significant reporting issues and judgments made in connection with the

preparation of the Company's financial statements. Among the items to be addressed are significant changes in the Company's selection or application of accounting principles, major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies, the adequacy of disclosures about changes in internal control over financial reporting, and the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

- Obtain, review and discuss reports from the independent auditor, prior to the filing of financial statements with the SEC, regarding (a) all critical accounting policies and practices to be used, (b) all alternative treatments of financial information within GAAP for policies and practices related to material items that have been discussed with management, ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the independent auditor, and (c) other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

- Discuss with management the Company's earnings press releases, including the use of pro forma information or non-GAAP financial measures, as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be done generally (consisting of discussing the types of information to be disclosed and the types of presentations to be made).

- Provide sufficient opportunity for the independent auditor to meet with the members of the Committee without members of management present. Among the items to be discussed is the independent auditor's evaluation of the Company's financial and accounting personnel, together with the cooperation that the independent auditor received during the course of the audit. If determined by the Committee to be appropriate under the circumstances then existing, the Committee or the Committee's designated representative may meet or talk with the Company's investment bankers and financial analysts who follow the Company.

- Review and discuss with management and the independent auditor the Company's quarterly financial statements and a draft of its Form 10-Q, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to the filing of the Form 10-Q, including the results of the independent auditor's reviews of the quarterly financial statements.

- Discuss with management the risks faced by the Company, including the Company's major financial risk exposures, and the steps management has taken to monitor and control those exposures and the guidelines and policies

to govern the process by which risk assessment and risk management is undertaken.

- Discuss with independent auditors the matters required to be discussed by the statement on Auditing Standards No. 16, as amended, regarding the conduct of the audit by independent auditors.

- Obtain and review a report from the independent auditor at least annually regarding: (a) the independent auditor's internal quality-control procedures, (b) any material issues raised by the most recent internal quality control review, peer review or Public Company Accounting Oversight Board review, of the firm or the Company, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues, and (c) all relationships between the firm and the Company or any of its subsidiaries; and to discuss with the independent auditors this report and any relationships or services that may impact the objectivity and independence of the auditors.

- Report regularly to the Board. Submit the minutes of all Committee meetings to, or review the matters discussed at each Committee meeting with, the Board.

- As determined by the Committee, investigate material matters brought to the Committee's attention within the scope of its duties. The Committee will have the power to retain outside counsel and other advisors for this purpose if, in its judgment, that is appropriate. Review with management and the independent auditor any published reports, correspondence with regulators or governmental agencies, or any employee complaints which raise material issues regarding the Company's financial statements or SEC reporting.

- Periodically assess any matter related to the financial matters of the Company and make policy recommendations to the Board which include actions and related disclosures of a transaction with any related person (as defined in Item 404 of Regulation S-K), any insider or affiliated party transaction or course of dealing, and any other potential conflict of interest situation, the scope of non-audit work to be allowed to be performed by the Company's independent auditor, together with hiring policies of the Company related to senior management of the Company's independent auditor, and qualification of the independent auditor.

- Obtain reports from management, internal auditing personnel, the Company's general counsel and the independent auditor regarding compliance with applicable laws and regulations and with the Company's Code of Business Conduct and Ethics (the "Code") to the extent tasked

under the Code to be within the responsibilities of the Committee or its chairman. Discuss with the Company's general counsel and outside legal counsel as needed any legal, compliance or regulatory issues that could have a material effect on the Company's financial statements or compliance policies, including the Code, as applicable.

- Monitor compliance with the Code, investigate any alleged breach or violation of the Code and enforce the provisions of the Code, in each case to the extent tasked under the Code to be within the responsibilities of the Committee or its chairman.

- Obtain assurance from the independent auditor that, in the course of conducting the audit, no illegal acts were detected or otherwise came to the independent auditor's attention that require disclosure to the committee under Section 10A(b) of the Exchange Act.

- Establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting, auditing or other matters. • Review the significant reports to management prepared by the internal auditing personnel and related management responses. The Committee will provide primary oversight of the internal audit function and will periodically review with management and the independent auditor the responsibilities, budget, staffing and scope of the internal audit function.

- Review disclosures made to the Committee by the CEO and CFO during their certification process for the Form 10-K and Form 10-Q regarding any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information and any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

- Prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement.

- Evaluate the performance and effectiveness of the Committee annually and report the results of such evaluation to the Board.

- At least annually the Committee will review, assess and update this charter

## V.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

75.      In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

76.      The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

77.      The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in deceptive marketing, engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. During the Relevant Period, Individual Defendants collectively and individually initiated a course of conduct that was designed to and did engage in deceptive marketing. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein was a direct, necessary, and substantial participant in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

78.      Each of the Individual Defendants aided and abetted and rendered substantial

assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

79.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Camber and was at all times acting within the course and scope of such agency.

## VI.

## BACKGROUND

### A.     Camber Has Been In Desperate Need Of Financing Since 2016 Which Led Its Directors To Enter Into "Death Spiral" Financing Deals With Discover Fund

80.     Camber is an independent oil and natural gas company that mainly acquires, develops, and sells crude oil, natural gas, and natural gas liquids. Since at least 2015, Camber has been desperate for cash to finance its operation.

81.     Camber has been involved in highly dilutive, risky, financing transactions with Discover Fund throughout the Relevant Period which its directors in 2017 admitted that they did not understand the nature and extent of the terms and conditions of the Series C preferred convertible stock ("Series C") sold in the financing agreements with Discover.

82.     Wikipedia defines securities with characteristics similar to the Series C as "Death Spiral Financing." Under a "death spiral" scenario, the holder of the convertible debt might short the issuer's common stock at which time the debt holder converts some of the convertible debt to common shares with which he then covers the debt holder's short position. The debt holder continues to sell short and cover with converted stock, which, along with selling by other

shareholders alarmed by the falling price, continually weakens the shares price and allows the death spiral lender to convert into an ever-increasing amount shares making the shares unattractive to new investors and possibly severely limiting the company's ability to obtain new financing if necessary. Last accessed April 4, 2022, 6:11 p.m. https://en.wikipedia.org/wiki/Death_spiral_financing.

83.     Camber first issued the Series C redeemable convertible preferred stock to Discover Fund in 2016, while Camber was still named "Lucas Energy." Less than one year later, that death spiral financing revealed its catastrophic consequences to Camber and its directors.

84.     On April 6, 2016, Camber entered into (i) a Securities Purchase Agreement to sell redeemable convertible subordinated debenture and a warrant to purchase 1,384,616 shares of common stock at an exercise price of $3.25 per share and (ii) a Stock Purchase Agreement to sell up to 527 shares of Series C to Discover Growth Fund. The Series C terms included certain "triggering events" which when triggered would result in massive dilution of Camber equity and voting power.

85.     The terms of the Series C stock (as reflected in its Certificate of Designation) also imposed accounting requirements for Camber which it failed to implement. Camber ignored those requirements and thus reported an artificially materially low common stock count and failed to have its SEC filings reflect the correct amount of total shares outstanding.

86.     On September 2, 2016, 53 shares of Series C were sold to Discovery for $526,450.00 under a "Stock Purchase Agreement." On October 7, 2016, Discover exercised the Warrant to purchase common stock and paid $4.5 million to Camber.

87.     On November 17, 2016, the remaining 474 shares of C were sold to Discovery by Camber for $4,763,000.00 under the Stock Purchase Agreement. In connection with the

November 17, 2016 purchase Discover and Camber agreed that certain "triggering events" had occurred as defined in the Stock Purchase Agreement. By agreeing to the occurrence of "trigger events," Discover was entitled to impose much more onerous interest rate and conversion terms on Camber and to force Camber to issue approximately 13 million common shares of Camber to Discover. This issuance increased Camber's stock float from 16 million shares in or about October 2016 (before any Discover conversions) to approximately 30 million shares by May 2017.

**B.     Camber Defendant Directors Belatedly Realize Discover Fund Can Use The Series C To Sell Camber Common Stock Short And Convert The Series C Into Ever Larger Quantities Of Camber Common Stock Depressing Camber Stock Price And Increasing Dilution**

88.     Camber Defendant directors eventually realized that the financing deal with the Discover Fund was toxic for Camber and the deals were one-sided in Discover's favor. In or about April 2017, Camber sued Discover Fund in federal court in Texas to rescind, unwind and/or re-write the Stock Purchase Agreement. Camber alleged that Discover engineered a conversion/exercise and short sale scheme which depressed Camber's stock price from $2.34 per share on October 7, 2016 to less than $.25 per share.

89.     That action was entitled *Camber Energy, Inc. v. Discovery Growth Fund*, (SDTX) (17-cv-01436). In that suit, Camber alleged that the financing agreements were deceptive and misinterpreted by Discover Fund to allow Discovery to engage in ". . . unlimited conversion and sale of shares" which would allow Discover to "continue to request  additional shares without limit-forever-until Camber's share value is non-existent and Camber is delisted from the NYSE ensuring it demise." Camber First Amended Petition, Docket No. 9 at ¶ 29, page 8.

90.     Camber sought injunctive relief enjoining Discover from exercising rights under the Agreements that would allow Discover "unlimited conversion and sale of shares." On May

11, 2017, United States District Judge Sim Lake denied any relief for Camber and characterized Camber's claim as: "Camber essentially alleges that it failed to adequately scrutinize its agreements with Discover before signing them . . ." Memorandum Opinion and Order dated May 11, 2017.

91.     In or about May 2017, the directors of Camber discovered that the principals of the Discover Fund, namely D. Sims, B.T. O'Neil, J.L. Kirkland and K.R. Coulson were also principals of Ironridge Global Partners LLC ("Ironridge") and that Ironridge was the subject of Administrative and Cease-And-Desist Proceedings brought by the SEC (File No. 3-16649) in which the SEC alleged that Ironbridge had violated Section 15(a) and 20(b) of the Securities Act of 1934 when it extended financing to microcap stock issuers with "price protection formulas" (similar to those in the Series C).

92.     Camber made inadequate disclosure of this suit in its 2017 10-K signed by Defendants Zeidman and Schleizer regarding the disposition of that lawsuit and the terms of the Series C Convertible stock and the legal proceedings against Discover's principals-controlled entities. That 10-K was issued in mid-2017.

93.     On August 21, 2017, the SEC issued an Order Making Findings And Imposing Remedial Sanctions And Imposing A Cease-and-Desist Order. Release No. 81443 ("SEC Sanctions Order") wherein it found, *inter alia*,:

> That Ironridge, through a controlled entity [controlled by Discover Fund's principals], sold shares in the open market of shares it received in financing deals thus contributing to decreasing the share price and increasing the number of shares [issuable under the financing deals] applicable price protector formulas . . . Order at ¶35.

C.     **More Toxic Discover Fund Financings Are Recommended By Camber's Directors From 2018-2020 In Proxy Solicitations For Shareholder Approval**

94.     During the relevant period, Camber's directors caused Camber to issue materially false and misleading proxy statements soliciting shareholders votes in favor of (a) their election as directors and for director compensation; (b) approval of issuance of additional common shares; and/or (c) approval of the additional death spiral financing agreements ("Stock Purchase Agreements") with Discover Fund.

95.     Notwithstanding their knowledge of the foregoing, Camber's directors continued to sell Series C stock to Discover in 2017, 2018, 2019 and 2020. Furthermore, when Camber's directors recommended, in Proxy Solicitations, that Camber shareholders vote in favor of toxic Series C financings with Discover Fund, those directors failed to disclose the material adverse information they knew about Discover's principals and other material adverse information.

96.     On November 29, 2017, Defendant Zeidman as Chairman of the Camber Board caused Camber to issue a Proxy Statement to Camber shareholders for a shareholder vote on January 9, 2018 which recommended to Camber shareholders that they vote in favor of, *inter alia*, "Proposal 4" which sought approval for two separate items which under SEC regulations should <u>not</u> have been "bundled under one proposal": issuance of common stock in excess of 20% of Camber's then outstanding common stock <u>and</u> "ratification of the terms of the October 5, 2017 Stock Purchase Agreement." That proxy was materially false and misleading because it failed to disclose adequately the risks to Camber inherent in selling Series C convertible stock to Discover Fund; failed to adequately disclose terms and provision of the transaction; failed to disclose the lawsuit against Discover Fund in Spring 2017 and failed to disclose the SEC Sanctions Order against a similar investment company controlled by the principals of the Discover Fund for violations of securities laws in connection with securities with terms similar to the Series C. The Proxy also violated SEC regulations by "bundling" into one proposal the vote of stock issuance

and the ratification of the 2017 Stock Purchase Agreement as part of the same proposal. The foregoing facts were not disclosed in connection with this vote nor in any subsequent Forms 10Ks; 10-Qs or Proxies.

97.     On October 27, 2018, Company entered into a Stock Purchase Agreement with Discover Fund for the purchase and sale of 2,941 shares of Series C Stock. On January 9, 2019, Camber's directors, Schlott, Miller, Zeidman and Schleizer caused Camber to issue a materially false and misleading Proxy recommending that shareholders vote in favor of approving issuance of shares and a Stock Purchase Agreement dated October 29, 2018.

98.     On February 19, 2019 Camber held its Annual Meeting of Stockholder at which shareholders' votes in favor of election of directors were solicited in a Proxy Statement ("2019 Proxy") issued to shareholders which concealed material details of Camber's financing with Discover including an explanation of the consequences of the conversion terms and the SEC Order Against Discover funds principals; and their other lending vehicle and the Discover Fund's principals' role in Ironridge. The Proxy materially misrepresented (a) the number of shares outstanding; (b) the extent of dilution of shareholders' voting power and equity interest; and (c) the fact that Discover's principals had been sanctioned in connection with financing agents similar to the Series C.

99.     Unless there is an accurate count of a company's outstanding shares a shareholder will be misled about its ownership interest, voting power and share value.

100.    Thus, the SEC requires that issuers disclose the number of shares outstanding on the cover pages of all registration statements, annual reports, and quarterly reports and Form 8-K mandates prompt disclosure of sales of unregistered securities. The instructions to Form 8-K provide:

> **(a)** *If the registrant sells equity securities in a transaction that is not registered under the Securities Act, furnish the information set forth in paragraphs (a) and (c) through (e) of Item 701 of Regulation S-K (17 CFR 229.701(a) and (c) through (e).* For purposes of determining the required filing date for the Form 8-K under this Item 3.02(a), the registrant has no obligation to disclose information under this Item 3.02 until the registrant enters into an agreement enforceable against the registrant, whether or not subject to conditions, under which the equity securities are to be sold. If there is no such agreement, the registrant must provide the disclosure *within four business days* after the occurrence of the closing or settlement of the transaction or arrangement under which the equity securities are to be sold.

101.    The 8-K requirement ensures that investors receive timely notice of the dilutive transaction as a stand-alone disclosure rather than await a quarterly or annual filing where its significance can be lost in those voluminous filings.

102.    The SEC has ordered (after notice-and-comment rulemaking) that the conversion of convertible securities into common stock is a sale of unregistered securities that must be disclosed using Form 8-K:

> Commenters suggested that issuances of unreported equity securities through conversion and similar transactions should not require an Item 8-K filing. *We believe that, given the 1% and 5% thresholds' we have adopted and the importance of equity security issuances, these types of transactions should be covered.*

*Id.* at *20.

103.    Thus, Camber was required to disclose on Forms 8-K Discover's conversion of its convertible securities into common shares whenever the conversions caused Camber's outstanding stock to increase by 5% or more.

104.    On January 31, 2020, Camber issued a Proxy Statement ("1.31.20 Proxy") soliciting shareholders votes in favor of electing directors to the Company's board of directors. The shareholders meeting and vote was held on March 31, 2020. Defendants Schlott, Schleizer,

Zeidman and Miller were re-elected. The Proxy statement issued to shareholders soliciting their vote concealed the material details of Camber's financing with Discover. The Proxy materially misstated the number of shares outstanding and the extent of dilution of shareholder voting power and equity interest.

105.    Notwithstanding its disastrous experience with Discover, Defendants continued to enter into similar death spiral financing agreements with Discover in order to proceed with the Viking Acquisition.

106.    On February 20, 2020, Company entered into a Stock Purchase Agreement with Discover for the purchase and sale of 525 shares of Series C. Camber lent Viking $5 million that same day. The loan left Camber with less than $1 million in cash. That Stock Purchase Agreement ("2020 SPA") was put to a shareholder vote on April 16, 2020 via a March 3, 2020 proxy statement.

107.    On March 3, 2020, Camber issued a Proxy Statement ("March 2020 Proxy") soliciting shareholders votes on April 16, 2020 in favor of (i) approval of an amendment to Camber's Articles of Incorporation to increase Camber's authorized common shares from 5,000,000 to 25,000,000; (ii) approval for issuance of more than 19.99% of Camber's common stock issuable upon conversion of Series C; and (iii) approval of the Stock Purchase Agreement. The shareholders meeting and vote was held on April 16, 2020 and all proposals were approved. Defendants Schott, Schleizer, Zeidman and Miller caused Camber to issue the Proxy.

108.    The January 2019 Proxy and March 2020 Proxy, in addition to being materially false also violated the "anti-bundling" rules of the SEC under SEC 14 because shareholders were forced to vote on one proposal which included both the authorization of issuance of shares and the approval of the Stock Purchase Agreement as part of a single "Proposal." Separately, the

Proxy violated Section 14 because it was materially false and misleading for failure to fully disclose all details of the Series C financing. The Proxy materially misstated the number of shares outstanding and the extent of dilution of shareholder voting power and equity interest and the Discover principals past sanctioning by the SEC.

109.     On June 22, 2020, Company entered into a Stock Purchase Agreement with Discover Fund for the purchase and sale of 630 shares of Series C for $6 million. On June 25, Camber lent Viking $4.2 million. On June 26, Viking used $4 million to pay off a loan maturing on June 30. Later 600 of the Series C stocks were exchanged for Camber common stock by Discover and 30 remain issued and outstanding.

110.     On December 11, 2020, Discover exchanged 600 shares of Camber Convertible Securities with a $6 million face value for a $6 million promissory note with an interest rate of 10%. The note's terms required Camber to complete its reverse merger with Viking by March 11, 2022.

111.     In a preliminary proxy to the final January 8, 2021 Proxy, one of the proposals up for a vote was an amendment to Camber's Articles of Incorporation to increase the number of authorized shares from 25,000,000 to 75,000,000. On December 21, 2020 Camber filed a revised preliminary proxy with the SEC for a Special Meeting of Shareholders. In that revised preliminary proxy of the proposal to amend Camber's Articles of Incorporation to increase the number of authorized shares was revised to increase the authorized share count to 250,000,000.

112.     In that Proxy, Camber represented that it had 25,000,000 shares of stock outstanding as of December 23, 2020.

113.     On December 23, 2020, Camber borrowed $12 million more from Discover to facilitate a transaction between itself and the Doris-controlled Viking.

114.    While shareholders were informed as to the number of shares authorized by Camber, they were misled as to the number of shares outstanding. The latter number is the most material, informative and important number for investors.

115.    On January 8, 2021 Camber issue a final Proxy Statement ("January 2021 Proxy") soliciting shareholders votes in favor of increasing Camber's authorized shares of common stock from 25,000,000 to 250,000,000 through an amendment to Camber's Articles of Incorporation.

116.    In that proxy the Board recommends that you vote "FOR" the adoption of the amendment increasing shares. In explaining the reason for the amendment, the Proxy stated:

> We desire to authorize additional shares of common stock to ensure that enough shares will be available upon conversion of the Series C stock.

117.    The Proxy was caused to be issued by Defendants Doris, Green, Zeidman and Miller. The Proxy represented that the conversion of 2093 outstanding Series C stock was then currently convertible into "approximately 91,850,607 shares of common stock . . . and further adjustment as provide in the designation of such Series C stock" the owner of the Series C stock at the time was Discovery Growth Funds.

118.    The shareholders vote to, *inter alia*, increase the authorized shares to 250,000,000 on February 23, 2021.

**D.    Camber Bails Out Doris And Viking With Money
It Received From Sales Of Series C Stock To Discover**

119.    On February 5, 2020, Camber issued a press release announcing the agreement and plan of Acquisition with Viking. As part of the Agreement, Camber agreed to loan Viking $5 million. Camber did not have the funds available so it turned to Series C financing from Discover.

120.     By December 31, 2019, as set out in its 2019 10-K, Viking had annual revenues of $34.6 million, a net loss of $19.4 million, and owed more than $104 million in debt. Viking's 2019  10-K admitted that there was substantial doubt about its ability to continue as a going concern, mainly because it had $22 million in debt maturing in 2020 and no cash to pay it off. Viking's obligations included a $13 million note due in August 2020, as well as other obligations requiring principal payments of approximately $8.5 million in 2020.

121.     In the proposed merger, the surviving entity would be Camber. Camber would acquire substantially all of Viking's assets in exchange for Camber shares.  Thus,  Camber shareholders would keep their shares, while Viking shareholders were issued new Camber shares in proportion to their holdings of Viking shares. But the reverse merger provided that no matter how many Camber shares were outstanding before the merger, Viking's shareholders would hold 80% of the post-merger entity's shares, and Camber 20%. However, the Merger stalled and instead Camber borrowed more and more money from Discovery to buy more Viking equity from Viking.

122.     As part of the reverse merger, Viking's management would replace Camber's. Thus, Doris would control the merged company. Upon signing of the merger agreement Defendant Doris assumed de facto control of Camber.

123.     Despite being fiduciaries, Camber's executives had little financial interest in the Company. According to Camber's  10-K for the year ended March 31, 2020, Camber's executives collectively held 7 Camber shares. They negotiated cash-only compensation agreements, so they were not personally exposed to declines in Camber's stock price. In August 2020, Camber's Board of Directors voted to provide each director and executive $150,000 which would be paid upon the completion of a reverse merger with Viking. Thus, Camber executives and directors were

financially aligned with Viking's interests, and not the fiduciary obligations they owed to Camber's shareholders.

124.    Doris and Discover's incentives were also aligned with each other, but not with the incentives of Camber shareholders.  Doris holds three types of securities in Viking Energy. First, Doris holds 222,223 common shares outright. Second, Doris owns 1,666,667 warrants, each to purchase one share. [1]The exercise price was $0.30/share until December 21, 2020, when Viking reduced it to the nominal sum of $0.001  for no consideration. Because Doris thereafter could exercise all 1,666,667 warrants for virtually nothing, he effectively owned 1,888,890 shares. Thus, on the surface, Doris only held 2.8% of Viking's approximately 66.5 million shares.

125.    The substantial majority of Doris's voting interest in Viking consists of 28,096 Viking Series C preferred shares ("Viking Convertible Shares"). While the precise number of votes Doris controlled fluctuated,  it was always enough to give him majority voting control over Viking at all times relevant hereto.

126.    To proceed with the closing of the Acquisition, Viking and Camber were required to submit certain regulatory SEC filings, such as quarterly and annual reports. On August 13, 2020, Camber issued a press release detailing a projected timeline of every filing each party was required to submit, which included an estimated Acquisition closing date for Fall 2020. For reasons then undisclosed, the original deal structure had constant delays. By October 9, 2020, Camber issued a press release informing investor that Company was finalizing an amendment to its pre-effective Registration Statement on Form S-4 filed with the SEC in connection with the Merger. In addition, Camber assured investors that Viking and Camber had nearly satisfied all respective conditions to closing the Acquisition. This was false.

---

[1]        Unless otherwise noted, references to Viking shares are to as-converted shares after a December 31, 2020 1:9 reverse stock split.

127.     Until August 2020, Doris's voting control was not coupled with a significant economic interest. According to Viking's 2019 10-K, at the time, each Viking Convertible Shares was convertible into just one common share. Thus, Doris's Viking Convertible Shares offered him little economic interest in Viking.

128.     That all changed in September 2020. Buried at the bottom of a Form 8-K filed September 3, 2020, Viking announced that the Viking Convertible Shares had been amended such that each share would not only entitle the holder to votes equivalent to 4,900 common shares but could also be converted into 4,900 common shares, giving Doris a majority economic as well as voting interest in Viking.

129.     After a December 2020 amendment, Viking Convertible Shares each held the votes of and were convertible into *37,500* common shares. In total, Doris's Viking Convertible Shares were convertible into approximately 1.05 billion Viking common shares.

130.     Doris paid no consideration for this amendment, the purpose of which was to serve Doris's personal financial interests. The amendment was disclosed in Viking's filings five days after Camber announced the merger. The amendment was never disclosed by Camber.

131.     A December 31, 2020, 1:9 reverse stock split then reduced the total number of Viking shares outstanding to 51.6 million.

132.     The reverse stock split was disclosed in Viking's SEC filings, but not in Camber's. It applied to shares outstanding, but not shares issuable upon Doris's conversion of Viking Convertible Shares into Viking common shares.

133.     Doris's billion shares would account for more than 95% of Viking's equity.

134.     Because Doris did not own any Camber shares but effectively owned the overwhelming majority of Viking shares, Doris suffered a limited financial penalty from dilution

of Camber's shareholders. Likewise, Discover received more shares if Camber's stock price fell so it was partially hedged against dilution.

135.    The proposed Merger never went forward.

136.    Instead, on December 23, 2020, Camber entered into a Securities Purchase Agreement (the "Purchase Agreement") with Viking to acquire 236,470,588 shares of Viking common stock, constituting 51% of the common stock of Viking in consideration of (i) $10,900,000 in cash and (ii) Camber canceling $9,200,000 in promissory notes previously issued to Camber by Viking.

137.    Viking's own financial advisor, Scalar LLC, confirmed Viking's value to be between $0 to $20 million depending on the methodology used, with a $0 to $1 million valuation using a true discounted cash flow analysis, and Camber's financial advisor, Mercer Capital, came to a similar conclusion with an implied equity value for Viking of $0 to $34 million.

138.    On December 24, 2020, Camber issued a press release announcing that it had acquired a controlling interest in Viking. In addition, Defendant Doris, Viking's then-current President & CEO, was formally appointed to Camber's Board of Directors and became the Company's new President & CEO. Defendant Doris stated in relevant part:

> We are extremely pleased to have closed this transaction. The new deal is an alternative to the previous Acquisition arrangement, and we believe it is even more beneficial to the stakeholders of both Camber and Viking as it allows the entities, individually and collectively, to immediately pursue other value-added opportunities while concurrently addressing the plan to fully combine the two companies.

139.    On January 8, 2021 Camber acquired additional Viking common stock to increase its ownership to 62% of Viking's equity via a purchase of an additional 1,153,846 Viking common stock for consideration in the total amount of $9,622,000. That acquisition was not in Camber's

best interest and was approved in bad faith and constituted a breach of duty of loyalty by Defendant Directors at the time.

140.    On January 8, 2021, Doris again caused Camber to place Viking's interests above its own. That day, Camber entered into a Securities Purchase Agreement with Viking ("January 2021 SPA"). Pursuant to the January 2021 SPA, Camber offered its own securities to a Viking creditor in exchange for forgiving Viking's debt:

a.    The creditor, EMC Capital Partners, LLC, forgave a promissory note issued by Viking to EMC with a face value of $20.9 million face value, along with all accrued interest and any other rights thereon.

b.    Camber issued EMC 1,890 of its Camber Convertible Securities;

c.    Viking paid EMC $325,000; and

d.    Viking issued 16.2 million of its shares to Camber.

141.    The Viking acquisition only further increased the financial pressure on Camber and depleted Camber's liquidity in exchange for worthless Viking assets.

142.    On February 18, 2021, Camber issued a press release regarding the Viking stock purchase. Defendant Doris stated in pertinent part the following: "We are very pleased with the transactions that have been completed between Camber and Viking in the last 60 days and are excited about this final step to fully combine the two entities, which we believe will put the organization in an even better position to increase stakeholder value."

143.    On February 15, 2021, Camber and Viking entered into a restructured reverse merger agreement ("2021 Reverse Merger Agreement"). The 2021 Reverse Merger Agreement no longer limited Viking to 80% of post-merger Camber's stock. Instead, it provided that each Viking share would be converted into one Camber share. This provision ensured that

Doris's ownership of Camber after the reverse merger would not be limited to 80%. That merger also stalled.

144.    On April 23, 2021, Camber borrowed another $2.5 million from Discover.

145.    On May 24, 2021, Camber issued a press release stating that on May 21, 2021, that NYSE notified Camber that it was no longer in compliance with the listing standards because "given the Company failed to timely file (the "Filing Delinquency") its Form 10-K for the 9-month period ended December 31, 2020 (the "Report")." The press release provided an explanation for the delinquency, stating the following:

> Such further delay in filing the Report past the deadline set forth in the Form 12b-25 is due to issues that have arisen in connection with (i) finalizing the determination of the fair values of both assets and liabilities associated with the Company's acquisition of a controlling interest in Viking Energy Group, Inc. in December of 2020, and (ii) key personnel changes at the Company's independent auditing firm. The Company is taking steps to complete the required accounting and plans to file the Report as soon as practicable.

146.    On May 24, 2021, Viking filed a quarterly report on Form 10-Q with the Securities and Exchange Commission (SEC), disclosing the Company's abysmal financial and operational performance for the quarter ended March 31, 2021. The quarterly report revealed a first quarter GAAP earnings per share of ($0.13), compared to GAAP earnings per share of $1.39 in the same quarter prior year 2020, representing a 109.35 percent year-over-year decrease, and first-quarter revenue of $10.49 million, compared to revenue of $11.79 million in the same quarter the year prior, representing an 11% year-over-year decrease.

147.    Camber's stock price declined $0.02 per share, or 3.17%, following Viking's first quarter 2021 results.  Following the disclosure of Camber's non-compliance notice and Viking's disastrous first-quarter results, Camber's stock price continued to decrease by an additional $0.04 per share, or 6.56%, to close at $0.57 per share on May 25, 2021.

148.     On May 25, 2021, Camber issued a press release regarding Viking's financial results for quarter ended March 31, 2021. The press release boasted Viking's financial prospects and future growth. It stated in pertinent part: "We are pleased with Viking's Q1 results, especially following the unprecedented conditions experienced in 2020. We are extremely encouraged with the foundation we have established and are intensely focused on pursuing growth opportunities."

149.     The Viking numbers and financial metrics told a very different story.  As of June 30, 2021, Viking had:

- negative $15 million in shareholder equity/book value.
- financial statements noting "substantial doubt regarding the Company's ability to continue as a going concern."
- nearly half (48%) of its $101.3 million in outstanding debt (at face value), was scheduled to mature and come due over the following 12 months.
- noted that it "does not currently maintain controls and procedures that are designed to ensure that information required to be disclosed by the Company in the reports it files or submits under the Exchange Act are recorded, processed, summarized, and reported within the time periods specified by the Commission's rules and forms." Viking's CEO "has concluded that these [disclosure] controls and procedures are not effective in providing reasonable assurance of compliance."
- disclosed that a key subsidiary, Elysium Energy, was "in default of the maximum leverage ratio covenant under the term loan agreement on June 30, 2021"; this covenant caps the entity's total secured debt to EBITDA at 2.75 to 1.

150.     On July 9, 2021, Camber sold Discover-affiliate Antilles 1,575 Camber Convertible Securities for $15 million. Then, on July 29, 2021, Camber Energy bought 27.5 million Viking common shares directly from Viking for $11 million.

151.     On July 29, 2021 the additional Viking common stock Camber acquired increased its ownership to 73% of Viking's equity.

152.     Despite being advised and warned by two independent financial advisors that Viking may have zero value, the Defendants caused Camber to continue to acquire Viking equity at inflated prices and continued to waste corporate assets in subsequent Viking transactions through July 2021 bringing Camber's Viking stake up to 69.9 million shares (73% of Viking's

total common shares) in exchange for cash, debt forgiveness, and debt assumption valued by Viking at $50.7 million.

153.     Defendants always referred to Camber's investment into Viking without adjusting for the overwhelming dilution from Doris' s Viking Convertible Securities.

154.     In truth, when Doris converted his Viking Convertible Shares, Camber would only own 18.4% of Viking's shares, not 51 %, while Doris would own more than two thirds.

155.     The Camber purchase of a majority stake in Viking served Doris's financial interests. Camber's money rescued Viking from an impending default. As described in Viking's Q3 2020 10-Q, as of September 30, 2020, Viking owed: (a) notes with a $6.4 million face value due in December 2020; (b) a revolving credit facility with a $6.8 million balance due May 2021; (c) a $15.6 million note payable due June 2021; and (d) a term loan with a face value of approximately $34.3 million.

156.     On this news, Camber's stock price fell $0.02 per share, or 3.17%, to close at $0.61 per share on May 24, 2021 and fell $.03 on May 25, 2021 to $.57 per share.

157.      On August 16, 2021, Viking filed a quarterly report on Form 10-Q with the SEC, reporting its financial and operating results for the quarter ended June 30, 2021. That quarterly report disclosed, among other results, a net loss of $9.85 million for the quarter and that "[a]s of June 30, 2021, [Viking] has a stockholders' deficit of $15,054,324 and total long-term debt of $95,961,611." With respect to Viking's liabilities, Form 10-Q disclosed, among other things:

> The largest components of current liabilities creating this working capital deficiency are [*inter alia*] . . . a term loan agreement with a face value of approximately $31.6 million as of June 30, 2021, which, although it has a maturity date of August 3, 2022, has been included as a current liability in the accompanying balance sheet *as [Viking]'s subsidiary, Elysium Energy, LLC, and other parties to the term loan agreement, are in default of the maximum leverage ratio covenant under the term loan agreement at June 30, 2021*.

158.     However, Camber continued to boast Viking's successful second quarter.  On August 17, 2021, Camber issued a press release detailing Viking's second-quarter results ended June 30, 2021. It stated pertinent part:

> *We are pleased with Viking's second quarter results and are very excited about steps we have taken subsequent to the end of Q2 to strengthen the organization*, including Viking's recent acquisition of a majority interest in Simson-Maxwell Ltd., a leading power generation and energy solutions company.

159.     Defendants allowed Camber to misinform investors of the accurate count of the Company's number of shares of common stock issued and outstanding.

160.     On December 3, 2021, the Securities and Exchange Commission obtained a final judgment against Tom Simeo, the former Chairman and Chief Executive Officer of Viking for making materially misleading disclosures in Viking's publicly filed reports regarding Viking's purported Chief Financial Officer by claiming Viking had a CFO for SOX certifications, when in fact, he was forging a fake signature in SEC filings. See https://www.sec.gov/litigation/litreleases/2021/lr25280.htm (last visited on March 8, 2022).

161.     Given this investigation into the Viking CEO and obvious fraudulent activity at Viking, there is probable cause to believe Camber directors in 2020 and 2021 failed to conduct even the most basic diligence in approving the Viking Acquisition and subsequent equity purchases or recklessly ignored the fact that Viking was previously operating without a CFO.

### F. Camber Directors Were On Notice (Via A Comment Letter From The SEC In Fall 2020) That Camber Was Falsely Reporting An Artificially Low Number Of Shares Outstanding – Camber Director Waited Over A Year Before Disclosing This To The Public

162.     The reverse merger planned between Viking and Camber involved the issuance of a controlling stake in Camber shares to Viking.  Thus, to complete the reverse merger, Viking and

Camber were required to complete a Registration Statement on Form S-4. A draft of the Registration Statement was filed on September 4, 2020, for the SEC's review.

163. In reviewing the Registration Statement, the SEC determined that Camber's accounting for Camber Convertible Securities had been false and in violation of Generally Accepted Accounting Practices.

164. The SEC's determination required Camber to restate its financial statements. Unless and until Camber restated the financial statements, the SEC would not approve the S-4, and the reverse merger would not be completed. Camber never produced these financial statements, so the merger never closed.

165. By September 30, 2020, Discover had accumulated 2,693 Camber Convertible Securities.

166. But by September 2020, Camber already had 25 million common shares issued and outstanding, the maximum then authorized.

167. The Camber Defendants and the Discover Defendants arrived at a solution that served both their interests. First, Doris would cause Camber to take on dilutive funding from Discover in which Discover provided Camber cash in exchange for Camber Convertible Securities. Second, Camber would transfer the money to Viking. Third, Discover would convert its Camber Convertible Securities into common stock and sell those securities. Fourth, Discover would recycle some of its sales proceeds into further funding Camber, thereby restarting the cycle.

168. Accordingly, to convert more of Discover's Camber Convertible Securities and sell the resulting common shares, the Discover Defendants needed Camber to increase its maximum authorized shares.

169.    Investors like Discover who fund convertible securities transactions  always face one problem:  how to sell the common shares. obtained through conversion without running afoul of SEC regulations.

170.    Distribution  of the underlying  securities, however, is Discover's business model. As Discover principal Kirkland explained in a declaration under penalty of perjury in an adversary proceeding styled *Immune Pharmaceuticals, Inc. v. Discover Growth Fund, LLC,* A.P.  19-02033 (VFP), Dkt. # 22-2 (Bankr. D.N.J. 2020):

> Discover was a lender, and not a long-term investor having upside potential. The 2015 Transaction with Discover Cayman involved convertible preferred stock, which  we had  immediately converted up to the maximum  4.99% common stock ownership, sold those shares as quickly as reasonably possible without causing undue harm to the stock price, then immediately converted again back up to  the  4.99%  limit. We  methodically  continued  these  prompt seriatim  conversions  until  all of the preferred  stock was converted,  and thereby  eliminated,  leaving Discover  with no upside potential.  Even that transaction,  which  was  a straight equity purchase,  was  not  a long-term investment with significant upside potential.

*Id.* ¶10.

171.    Accordingly, it was critical that Discover either ensure that the underlying Camber common shares to be issued upon conversion were registered or qualified under an exemption from registration.

172.    During 2020-2021 Bloomberg, Yahoo!  Finance, and Google Finance all reported that there were 104.2 million Camber shares outstanding.

173.    Yet as Camber acknowledged in an October 6, 2021  8-K, by that date, there were actually 249.6 million Camber shares issued and outstanding.

174.    The vast majority  of the secret additional shares resulted from conversions of Discover's Camber Convertible Securities. As Camber acknowledged in the October 6, 2021 8-K:

The increase in our outstanding shares of common stock from the date of the Company's February 23, 2021 increase in authorized shares of common stock from 25 million shares to 250 million shares, is primarily due to conversions into common ***stock by an institutional investor of shares of [Camber Convertible Securities] that were sold to the institutional investor in 2018 and/or*** [sic] ***2019,*** along with adjustments to such conversions and/or conversion premiums due in respect of such [Camber Convertible Securities], which were payable in shares of common stock.

175.     Only Discover purchased Camber Convertible Securities in 2018 or 2019, so the October 6, 2021  8-K was identifying Discover's conversions as the primary source of the new previously unreported Camber common shares.

176.     And on November 29, 2021, Camber filed a Proxy Statement that acknowledged that Discover had converted 1,575 of its Camber Convertible Shares to common shares. EMC, the only other holder of Camber Convertible Securities, held only 97 fewer such securities than Camber had issued to it.

177.     Between February 2021  and October 4, 2021, Discover sold on the order of 200-220 million Camber shares. During this time, Camber's shares never traded below $0.34, and that only for a short period. In September, Camber's stock price took off. It reached a closing price of $1.30 on September 9, 2021. Between September 10, 2021  and October 4, 2021, Camber's stock price did not fall below $1.22. It reached $4.85 on September 29, 2021. During this time, volume in Camber shares increased tenfold.

178.     Thus, the Discover Defendants' sale of Camber shares earned it at least high eight-figure profits, likely more than $100 million, and potentially as much as mid nine-figure. Camber is the most lucrative investment in Discover's corporate history.

179.    The Discover Defendants rewarded the Camber Defendants  for their role in the scheme.  Camber  continued  to rely solely on Discover  and its affiliates for financing,  and Discover  kicked back a portion  of the proceeds  to Camber:

      a.      On December 9, 2021, Discover lent Camber $1  million in exchange for a promissory note in the amount of $1. 05 million, at 10% interest rate, secured by substantially all of Camber's assets;

      b.      On December 24, 2021, Discover lent Camber $25 million. The loan's terms provided that Camber would use the proceeds to buy out EMC's  Camber Convertible  Securities  as well as any secured loans due and payable within 90 days of closing. Thus, the loan ensured that only Discover and its affiliate would own Camber Convertible Securities shares; and

      c.      On December 30, 2021, Antilles (controlled by Defendant Kirkland) agreed to purchase up to  10,544 newly designated Series G Preferred Shares from Camber for $100 million.  Series G Preferred Shares' terms were similar to Camber Convertible Securities except that there were limits on the conversion price, including that it could not go to less than $0.05. Antilles paid Camber $6 million immediately. The remainder  would be paid in equal  quarterly  installments  during  2022. Camber was free to cancel any or all quarterly purchases.

180.    Camber and Discover Necessarily Conspired to Issue Discover Shares. To convert Camber Convertible Securities into common shares, Discover must first deliver notice to Camber or its transfer agent. The delivery notice must set forth, among other things, the number of shares to be issued to Discover.

181.    Upon receipt of the conversion notice,  Camber must,  among either things, either affirmatively  agree with or dispute Discover' s assertions that it is entitled to the number of shares set out in its conversion notice:

      As soon as practicable, and in any event within 1 Trading Day of the Notice Time, time being of the essence, the Corporation will do all of the following: (i) transmit the Delivery Notice by facsimile or electronic mail to the Holder, and to the Corporation's transfer agent (the "Transfer Agent") with instructions to comply with the Delivery

Notice;[] and (iii) if it contends that the Delivery Notice is in any way incorrect, a through explanation of why and its own calculation, or the Delivery Notice will conclusively be deemed correct for all purposes.[2]

182.     Accordingly, both Camber and Discover had to authorize the issuance of shares. Thus, the Camber Defendants and the Discover Defendants necessarily conspired to issue the shares to Discover.

### G. Camber Could Not Issue True, Accurate And Complete Periodic Financial Statements And Risked Delisting

183.     Camber had failed to file to file financial statements with the SEC since September 2020 and was at risk of having it stock delisted from the New York Stock Exchange. Consequently, financial reporting services were forced to rely on outdated and irregular updates in SEC filings to calculate the Company's shares of common stock issued and outstanding.

184.     On October 31, 2020 Camber received a Comment Letter from the SEC alerting Camber to the fact that Camber had been incorrectly accounting for its total shares outstanding due to the Series C conversion terms. Camber did not disclose this until November 22, 2021 even though Defendants knew Camber was misrepresenting it share count. Nor did Camber correct its share count publicly until late 2021. Accordingly, Camber's 2019 Proxy; 1.31.20 Proxy; March 2020 Proxy; and January 2021 Proxy were materially false and misleading.

185.     Camber did not report the SEC's October 31, 2020 Comment Letter or its contents until November 21, 2021 when it filed an Amended 10-K for 2020.

186.     On December 1, 2020, Camber issued a press release stating that it "received an expected notice from the NYSE Regulation staff of the NYSE American Stock Exchange (the

---

[2]         Form of Certificate of Designation, I. G.1.c.

"NYSE") as a result of its failure to file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2020."

187.     The result of Camber's failure to follow proper accounting treatment of the sale of Series C resulted in material errors in Camber's 2020 and 2021 reported financial results which required it to restate its Annual Report on Form 10-K for the year ended March 31, 2020 inclusive to comparative financial statements for the year ended March 31, 2019 and the previously filed quarterly reports for the quarter ended June 30, 2020 and three months and six months ended September 30, 2020 financial statements reflect the "derivative liability" which would have materially adversely impacted Camber's financial condition. Camber, its officers and directors <u>and</u> Viking's officers and directors <u>knew this on October 31, 2020</u> when Camber received a "comment letter" from the SEC with respect to Amendment No. 2 to the Registration Statement on Form S-4 filed on October 14, 2020, wherein the SEC questioned Camber's historical accounting treatment regarding the sale of Series C stock.

188.     Camber filed a 10-K for the fiscal year ended March 31, 2020 on June 29, 2020 reporting approximately 12 million shares outstanding. The 2020 10-K was signed by Defendants Schott, Schleizer, Zeidman and Miller as directors and Schott in his additional capacity as Principal Executive Officer.

189.     On May 6, 2021, Camber submitted a notification of late filing on Form 12b-25 with the SEC, detailing the Company's failure to timely file transition report on Form 10-K with SEC for period ended December 31, 2020. This report trivialized the impact of Camber controlling interest in Viking and its effect on Company's delinquent financial statements and listing obligation with NYSE. It stated in relevant part:

The registrant plans to file its completed Transition Report on Form 10-K for the transition period ended December 31, 2020, on or before the fifteenth day following the prescribed due date.

The registrant anticipates a significant change in its results of operations for the nine-month transition period ended December 31, 2020, as compared to the nine-month transition period ended December 31, 2019, as the registrant completed an acquisition of Viking Energy Group, Inc. common stock during the most recent transition period. A reasonable estimate of the results of operations could not be made as of the current date as the registrant's accountants are still preparing the registrant's results of operations.

190.     Camber failed to submit mandatory filings with the SEC. On May 17, 2021, Camber filed a notification of late filing on Form 12b-25 with the SEC. Again, Individual Defendants continued to minimize the significance of Camber's controlling interest in Viking and the impact regarding Company's delinquent financial statements and listing obligation with NYSE. It stated in relevant part:

The registrant plans to file its completed Quarterly Report on Form 10-Q for the quarter ended March 31, 2021, on or before the fifth day following the prescribed due date.

The registrant anticipates a significant change in its results of operations for the quarter ended March 31, 2021, as compared to the quarter ended March 31, 2020, as the registrant completed an acquisition of Viking Energy Group, Inc. common stock at the end of 2020. A reasonable estimate of the results of operations could not be made as of the current date as the registrant's accountants are still preparing the registrant's results of operations.

191.     On July 9, 2021, Company entered into a Stock Purchase Agreement with an Investor for the purchase and sale of 1,575 shares of Series C.

192.     On July 14, 2021, Camber issued a press release announcing it had closed a $15 million dollar equity transaction from an institutional investor. The press release quoted Defendant Doris' comment, stating that:

These transactions serve as significant catalysts for advancing Camber's growth initiatives. The $15M commitment by the institutional investor is encouraging and seemingly reflective of the confidence in Camber and our operations, both short

and long term. We are excited about the Company's future and remain focused on forging a path toward profitability and increasing shareholder value.

193.   Notably, on July 12, 2021, the Company filed a Form 8-K with the SEC, which stated that the Company's shares of common stock issued and outstanding was 104.2 million. Later, on October 6, 2021, the Company reported 249.6 million shares of common stock issued and outstanding, almost a 150% increase from the prior amount reported.

194.   Camber filed a 10-K for the fiscal year ended March 31, 2019 on June 25, 2019 reporting approximately 46 million shares outstanding. The 2019 10-K was signed on July 1, 2019 by Schott, Schleizer, Zeidman and Miller.

195.   As a result of the misrepresentations of Camber's share count; Series C financing; Camber's accounting; and the extent of dilution of shareholders' voting power and equity interest all of Camber's 2019, 2020 and 2021 and Reports on Form 10-K Proxy Statements were materially false and misleading.

196.   On November 22, 2021, Camber filed its amended 10-K for the annual period ended December, 31, 2020 disclosing for the first time that the Company had received a comment letter from the SEC that had "questioned the Company's historical accounting treatment regarding the sale of our Series C Redeemable Convertible Preferred Stock." Specifically, that Form 8-K disclosed, in relevant part:

> On October 31, 2020, the Company received a comment letter from the SEC ("SEC Comment Letter") with respect to Amendment No. 2 to the Registration Statement on Form S-4 filed on October 14, 2020. Among other things, the SEC Comment Letter questioned the Company's historical accounting treatment regarding the sale of our Series C Redeemable Convertible Preferred Stock (the "Series C Stock"). The Company recorded such sales as "permanent equity" and the SEC Comment Letter suggested the appropriate accounting classification was something other than permanent equity given certain provisions within the Certificate of Designation for the Series C Stock ("COD"). After considering the SEC Comment

Letter and reviewing the COD, the Company and the holder of the Series C Stock determined there were several errors made in the drafting of the COD that could result in unintended consequences. Both parties agreed to subsequently correct the COD, and Certificates of Correction to the COD were filed on December 9, 2020, and on April 20, 2021 to correct the errors. Both parties agreed the corrections would be applied retroactive to the original filing date of the COD, being August 25, 2016; however, US GAAP requires a transaction to be accounted for in accordance with the terms of an agreement in effect during the period of the financial statements and, consequently, the Company determined that in accordance with the terms of the original COD, the Series C Stock should have been recorded as temporary equity instead of permanent equity. In addition, certain provisions of the original COD required the Company to recognize a derivative liability for certain conversions of the Series C Stock into common stock. After consultations with the SEC staff and the Company's accounting advisors, the Company determined: (i) the impact of the error(s) is material for the fiscal years ended March 31, 2019 and 2020; and (ii) to restate its Annual Report on Form 10-K for the year ended March 31, 2020, inclusive of comparative financial statements for the year ended March 31, 2019, the previously filed quarterly report on Form 10-Q for the three months ended June 30, 2020, and the previously filed quarterly report on Form 10-Q for the three and six month periods ended September 30, 2020.

197.    On November 29, 2021, Camber issued a Proxy Statement soliciting shareholders votes in favor of a proposal to amend Camber's Articles of Incorporation to increase the number of authorized shares of common stock from 250,000,000 to 1,000,000,000. Camber stated that most of the additional shares would be used to satisfy Discover Fund's conversion demand under the Series C stock terms.

198.    The stockholders meeting and vote was held on December 30, 2021.

**H.  The Truth Begins To Emerge**

199.    On October 5, 2021, Kerrisdale released a report alleging, that the "market is badly mistaken about Camber's share count and ignorant of [Camber's] terrifying capital structure," estimating the Company's "fully diluted share count is roughly triple the widely

reported number." Specifically, the Kerrisdale Report estimated that Camber's "fully diluted share count is roughly triple the widely reported number, bringing its true, fully diluted market cap, absurdly, to nearly $900 million." It was only in November 2021, that Camber revealed the share miscount and SEC comment letter for the first time.

200.    The Kerrisdale Report concluded that approximately 104.2 million common shares outstanding on July 9th, 99.7 % were created due to conversion of Series C preferred, which was primarily owned by one investor, Discover Growth Fund. Kerrisdale referenced Form 10-K filed with the SEC on September 30, 2020, which stated in pertinent part:

> Although Discover may not receive shares of common stock exceeding 9.99% of its outstanding shares of common stock immediately after affecting such conversion, this restriction does not prevent Discover from receiving shares up to the 9.99% limit, selling those shares, and then receiving the rest of the shares it is due, in one or more tranches, while still staying below the 9.99% limit. If Discover chooses to do this, it will cause substantial dilution to the then holders of its common stock. ***Additionally, the continued sale of shares issuable upon successive conversions will likely create significant downward pressure on the price of its common stock as Discover sells material amounts of Camber's common stock over time and/or in a short period of time***. This could place further downward pressure on the price of its common stock and in turn result in Discover receiving an ever-increasing number of additional shares of common stock upon conversion of its securities, and adjustments thereof, which in turn will likely lead to further dilution, reductions in the exercise/conversion price of ***Discover's securities and even more downward pressure on its common stock, which could lead to its common stock becoming devalued or worthless.***

201.    Individual Defendants were equipped with this knowledge and failed to disclose to investors the troubling issue of Camber's Series C preferred shares. In addition, Individual Defendants failed to inform investors of the precipitous dilution of Camber's common stock. Kerrisdale Report revealed the following:

> While the recent spike in common share count to 104.2 million as of early July includes some of the impact of ongoing preferred conversion, we believe it fails to include all of it. In addition to Discover's 2,093 shares of Series C preferred held as of February 2021, Camber issued additional shares to EMC Capital Partners, a creditor of Viking's, as part of a January agreement to reduce Viking's debt.[] Then,

in July, Camber issued another block of preferred shares – also to Discover, we believe – to help fund Viking's recent deals.[] We speculate that many of these preferred shares have already been converted into common shares that have subsequently been sold into a frenzied retail bid.

Beyond the Series C preferred, there is one additional source of potential dilution: debt issued to Discover in three transactions from December 2020 to April 2021, totaling $20.5 million in face value, and amended in July to be convertible at a fixed price of $1.25 per share.[]

202.    Additionally, the Kerrisdale Report revealed that Viking hired Scalar, LLC ("Scalar") to prepare a fairness opinion of the original Acquisition agreement with Camber. Scalar concluded that Viking's equity was worth "somewhere between $0 and $20 million, depending on the methodology used, with the "purest" methodology – a true, full-blown DCF – yielding the lowest estimate of $0-1 million."

203.    The Kerrisdale Report also discussed defendants Doris and Miller's involvement in the Viking transaction and their questionable background, in addition to a whole section discussing why "Camber's Stake in Viking Has Little Real Value."

204.    With regard to defendant Doris, the report states:

Viking itself also had a checkered past. Previously a shell company, it was repurposed by a corporate lawyer and investment banker named Tom Simeo to create SinoCubate, "an incubator of and investor in privately held companies mainly in P.R. China." But this business model went nowhere. In 2012, SinoCubate changed its name to Viking Investments but continued to achieve little. In 2014, Simeo brought in James A. Doris, a Canadian lawyer, as a member of the board of directors and then as president and CEO, tasked with executing on Viking's new strategy of "acquir[ing] income-producing assets throughout North America in various sectors, including energy and real estate." In a series of transactions, Doris gradually built up a portfolio of oil wells and other energy assets in the United States, relying on large amounts of high-cost debt to get deals done. But Viking has never achieved consistent GAAP profitability; indeed, under Doris's leadership, from 2015 to the first half of 2021, Viking's cumulative net income has totaled negative $105 million, and its financial statements warn of "substantial doubt regarding the Company's ability to continue as a going concern."

***

Since Camber is effectively a bet on Viking, and Viking, in its current form, has been assembled by James Doris, it's important to assess Doris's probity and good judgment. In that connection, it's noteworthy that, from December 2014 to July 2016, at the very start of Doris's reign as Viking's CEO and president, the company's CFO, Guangfang "Cecile" Yang, was apparently fictitious. (Covering the case in 2019, Dealbreaker used the headline "Possibly Imaginary CFO Grounds For Very Real Fraud Lawsuit.") This strange situation was brought to light by an SEC lawsuit against Viking's founder, Tom Simeo; just last month, a US district court granted summary judgment in favor of the SEC against Simeo, but Simeo's penalties have yet to be determined. The court's opinion provided a good overview of the facts (references omitted):

In 2013, Simeo hired Yang, who lives in Shanghai, China, to be Viking's CFO. Yang served in that position until she purportedly resigned in July 2016. When Yang joined the company, Simeo fabricated a standing resignation letter, in which Yang purported to "irrevocably" resign her position with Viking "at any time desired by the Company" and "[u]pon notification that the Company accepted [her] resignation"…Simeo forged Yang's signature on this document. This letter allowed Simeo to remove Yang from the position of CFO whenever he pleased. Simeo also fabricated a power of attorney purportedly signed by Yang that allowed Simeo to "affix Yang's signature to any and all documents," including documents that Viking had to file with the SEC.

Viking represented to the public that Yang was the company's CFO and a member of its Board of Directors. But "Yang never actually functioned as Viking's CFO." She "was not involved in the financial and strategic decisions" of Viking during the Relevant Period. Nor did she play any role in "preparing Viking's financial statements or public filings." Indeed, at least as of April 3, 2015, Yang did not do "any work" on Viking's financial statements and did not speak with anyone who was preparing them. She also did not "review or evaluate Viking's internal controls over financial reporting." Further, during most or all of the Relevant Period, Viking did not compensate Yang despite the fact that she was the company's highest ranking financial employee. Nevertheless, Simeo says that he personally paid her in cash.

Yang's "sole point of contact" at Viking was Simeo. Indeed Simeo was "the only person at Viking who communicated with Yang." Thus many people at Viking never interacted with Yang. ***Despite the fact that Doris has served as Viking's CEO since December 2014, he "has never met or spoken to Yang either in person or through any other means, and he has never communicated with Yang in writing."*** … To think Yang served as CFO during this time, but the CEO and other individuals involved with Viking's SEC filings never once spoke with her, strains all logical credulity. (Emphasis in original.)

It remains unclear whether Yang is even a real person. When the SEC asked Simeo directly ("Is it the case that you made up the existence of Ms. Yang?") he responded

by "invoking the Fifth Amendment. *While the SEC's efforts thus far have focused on Simeo, the case clearly raises the question of what Doris knew and when he knew it. Indeed, though many of the required Sarbanes-Oxley certifications of Viking's financial statements during the Yang period were signed by Simeo in his role as chairman, Doris did personally sign off on an amended 2015 10-K that refers to Yang as CFO through July 2016 and includes her complete, apparently fictitious, biography*.

Viking has also disclosed the following, which we believe pertains to the Yang affair (emphasis added): In April of 2019, the staff (the "Staff") of the SEC's Division of Enforcement notified the Company that the Staff had made a preliminary determination to recommend that the SEC file an enforcement action against the Company, as well as against its CEO and its CFO, for alleged violations of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder [laws that pertain to securities fraud] during the period from early 2014 through late 2016. The Staff's notice is not a formal allegation or a finding of wrongdoing by the Company, and the Company has communicated with the Staff regarding its preliminary determination. The Company believes it has adequate defenses and intends to vigorously defend any enforcement action that may be initiated by the SEC.

*Perhaps the SEC has moved on from this matter and will let Doris and Viking off the hook, but the fact pattern is eyebrow-raising, nonetheless.* A similarly troubling incident came soon after the time of Yang's "resignation," when Viking's auditing firm resigned, withdrew its recent audit report, and wrote a letter "advising the Company that it believed an illegal act may have occurred" – because of concerns that had nothing to do with Yang. First, Viking accounted for the timing of a grant of shares to a consultant in apparent contradiction of the terms of the written agreement with the consultant – a seemingly minor issue. But, under scrutiny from the auditor, Viking "produced a letter… (the version which was provided to us was unsigned), from the consultant stating that the Agreement was invalidated verbally." Reading between the lines, the "uncomfortable" auditor suspected that this letter was a fake, created just to get him of Viking's back.

205.    With regard to defendant Miller, the report states:

Founded in 2004, Camber was originally called Lucas Energy Resources. It went public via a reverse merger in 2006 with the plan of "capitaliz[ing] on the increasing availability of opportunistic acquisitions in the energy sector." But after years of bad investments and a nearly 100% decline in its stock price, the company, which renamed itself Camber in 2017, found itself with little economic value left; faced with the prospect of losing its NYSE American listing, it cast about for new acquisitions beginning in early 2019. That's when Viking entered the picture. *Jim Miller, a member of Camber's board, had served on the board of a micro-cap company called Guardian 8 that was working on "a proprietary new class of enhanced nonlethal weapons";* Guardian 8's CEO, Steve Cochennet, happened to

also be part owner of a Kansas-based company that operated some of Viking's oil and gas assets and knew that Viking, whose shares traded over the counter, was interested in moving up to a national exchange.

(*In case you're wondering, under Miller and Cochennet's watch, Guardian 8's stock saw its price drop to ~$0; it was delisted in 2019.*

(Emphasis added) (Internal citations omitted)

206.      On this news, Camber's stock price fell $1.56 per share, or 50.49%, to close at $1.53 per share on October 5, 2021.

207.      Following Kerrisdale's publication on October 6, 2021, Camber filed a current report on Form 8-K with the SEC, which verified the Kerrisdale Report's allegations regarding its diluted share count. Specifically, that Form 8-K disclosed, in relevant part:

> As of October 6, 2021, Camber . . . had **249,563,409 shares of common stock issued and outstanding**. The increase in our outstanding shares of common stock from the date of the Company's February 23, 2021 increase in authorized shares of common stock from 25 million shares to 250 million shares, **is primarily due to conversions into common stock by an institutional investor of shares of Series C Convertible Preferred Stock of the Company that were sold to the institutional investor in 2018 and/or 2019, along with adjustments to such conversions and/or conversion premiums due in respect of such Series C Preferred Stock, which were payable in shares of common stock**.

208.      In a Form 8-K filed on March 25, 2022, Camber was forced to disclose the disastrous results of its directors' reckless indifference to their responsibilities:

> Item 4.02 Non-Reliance on Previously Issued Financial Statements or Related Audit Report or Completed Interim Report
>
> On March 25, 2022, the audit committee of the board of directors (the "Audit Committee") of Camber Energy, Inc. (the "Company"), after discussion with the staff of the Securities and Exchange Commission, Company management and the Company's accounting and legal advisors, concluded that between August 2016 and April 2021 any sales of the Company's Series C Convertible Preferred Stock ("Preferred Stock") should not only have been classified in the Company's financial statements outside of *"permanent equity",* as stated in a previously filed Form 8-K filed on September 16, 2021, hut should also have included a

*"derivative liability"* based on a seven-year dividend commitment associated with the Preferred Stock. In April 2021 corrections and/or amendments to the Certificate of Designation ("COD") of the Preferred Stock were executed by the Company and the holders of the Preferred Stock to remove terms that supported classification outside of permanent equity and added terms to support a classification as permanent equity. The specifics of such corrections and/or amendments were set out in the Current Report on Form 8-K filed with the Securities and Exchange Commission on or about April 21, 2021.

As a result, the Company's financial statements for the periods between *the* fiscal year ending March 31, 2017, through the quarter ending September 30, 2020 (the "Impacted Periods") should no longer be relied upon. Similarly, any previously furnished or filed reports, related earnings releases, investor presentations or similar communications of the Company describing the Company's financial results for the Impacted Filings should no longer be relied upon.

Additionally, on March 25, 2022, the Audit Committee also determined that the unaudited financial statements included in the Company's Current Report on Form 8-K/A filed with the Securities and Exchange Commission on October 6, 2021, which disclosed information regarding the acquisition of common stock of Viking Energy Group, Inc. ("Viking") on December 23, 2020 (the "Acquisition"), should no longer be relied upon since the Audit Committee has determined that the Company should account for the investment using the equity method of accounting instead of using the acquisition accounting method.

The Company intends to file an amended Annual Report on Form 10-K/A with restated financial statements for the years ended March 31, 2019 and March 31, 2020, and to file amended Quarterly Reports on Form 10-Q/A with restated financial statements for the quarterly periods ended June 30, 2020, and September 30, 2020, in each case to reflect the appropriate accounting of the Preferred Stock outside of permanent equity and a derivative liability based on a seven-year dividend associated with the Preferred Stock.

The Company's management and the Audit Committee have discussed the matters disclosed in this Item 4.02 with the Company's independent registered public accounting firm, Turner, Stone & Company L.L.P.

## I.  **Summary of the Defendants' Wrongful Conduct**

209.    The Individual Defendants breached their fiduciary duties of Camber to shareholders in connection with voting on proposals because they allowed or permitted the Company to fail to file required reports with the SEC and/ or disseminate false and misleading Proxy statements.

210.    The Individual Defendants breached their fiduciary duties because  reasonable doubt exists as to whether a majority of the Board was disinterested and independent in approving the Viking Acquisition, or whether the Viking Acquisition was the product of a valid exercise of business judgment.

211.    The Individual Defendants also breached their fiduciary duties by entering into the Series C death spiral financing.

212.    The Individual Defendants breached their fiduciary duties to Camber because they willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact in their Proxy Statements and other filings with the SEC in violation of federal securities laws.

213.    The Discover Defendants aided and abetted all of the Individual Defendants fiduciary breaches.

## VII.

## **DAMAGES TO CAMBER**

214.    As a direct and proximate result of the Individual Defendants' conduct, Camber will lose and expend many millions of dollars.

215.    As a result of the foregoing, Camber has been named as a defendant in a federal securities class action lawsuit of investors who allege they were damaged when they purchased

Camber shares during the Relevant Period.

216.     The Securities Action has subjected the Company to losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company. The Individual Defendants' wrongful conduct will likely cost the Company tens of millions of dollars going forward.

217.     Such expenditures include, but are not limited to, the Viking Acquisition, legal fees associated with the federal securities lawsuit filed against the Company, its chief executive officer, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

218.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

219.     Camber's equity has been massively diluted by Series C financing.

220.     Camber has expended valuable cash and incurred debt to acquire Viking equity for prices for in excess of any reasonable valuation of the equity or assets.

221.     As a direct and proximate result of the Director Defendants' conduct, Camber has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Director Defendants' breaches of fiduciary duties.

## VIII.

## <u>DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS</u>

222.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the

breaches of fiduciary duties and gross and reckless mismanagement by the Individual Defendants.

223.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

224.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

225.     Plaintiff understands her obligation to hold stock throughout the duration of this action and is prepared to do so.

226.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Individual Defendants.

227.     Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

228.     The Company Board is currently comprised of four members–Doris, Zeidman, Miller, and Green (the "Director Defendants"). Thus, Plaintiff is required to show that a majority of the Defendants, *i.e.*, three, cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. Doris receives a salary from both Viking and Camber simultaneously and is conflicted. Zeidman and Miller face a substantial likelihood of personal unexculpated liability for breach of fiduciary duties and are thus not disseminated.

229.     The present board consists of Doris, Zeidman, Miller and Green, all of whom are named as Defendants herein and who face a substantial likelihood of personal liability not exculpated under Camber's governing documents or Nevada law.

230.     Each of the Directors approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

231.     Each of the Directors authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

232.     Additionally, each of the Directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**<u>Defendant Doris</u>**

233.     Defendant Doris is not disinterested or independent, and therefore, is incapable of considering demand because prior to his appointment as Camber's CEO, he served as a Viking's director since 2014. As a director, he was privy to information or was likely aware of Viking's dismal business prospects. He engaged in self-dealing because he was able to advance his position following the post-Acquisition agreement, rather than the interests of Camber and its shareholders.

234.     This lack of independence and financial benefits received by Defendant Doris render him incapable of impartially considering a demand to commence and vigorously prosecute this action.

235.     Moreover, as discussed above, the Kerrisdale Report discusses Doris's involvement in the Viking merger and thus Doris knew of the financial condition of Viking and how the merger would negatively affect Camber and yet allowed the Company to issue false and misleading statements. Given the foregoing, Doris breached his fiduciary duties to Camber and Doris cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

236.     In addition, Defendant Doris is a defendant in the Securities Action, which seeks to hold him liable for much of the same wrongdoing as is alleged herein.

237.     Defendant Doris participated in the issuance of materially false and misleading Proxy Statements and recommendations to shareholders.

238.     As such, Defendant Doris cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, as that would expose him to substantial liability and threaten his livelihood.

**Defendants Green, Zeidman and Miller**

239.     Demand on Defendants Green, Zeidman and Miller is futile because they have received and continue to receive fees earned for their roles as directors. Those Defendants participated in the issuance of materially false and misleading Proxy Statements and made materially false and misleading recommendations to shareholders to vote in favor of proposals to increase stock issuance and ratify and/or enter into stock purchase agreements with Discover Fund.

240.     Defendant Miller served as Chairman of the Audit Committee and Defendant Zeidman served as a member.  Pursuant to the Audit Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, accounting, legal, regulatory, and public disclosure requirements.  Thus, these Defendants were responsible for knowingly or recklessly allowing the Company to be in non-compliance with NYSE listing rules and procedures. Defendants Miller and Zeidman allowed Camber to have delinquent filings throughout the Relevant Period, risking NYSE delisting Camber. Additionally, Defendant Miller and Zeidman were aware of toxic nature of the Discover Fund the precipitous dilution of Series C preferred shares, which went undisclosed for months and allowed stocks to be traded at artificially inflated prices.

241.     Further, these Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, these Defendants caused these improper statements.

242.     Also as discussed above, the Kerrisdale Report discusses Miller's involvement in the Viking merger and thus Miller knew of the financial condition of Viking and how the merger would negatively affect Camber and yet allowed the Company to issue false and misleading statements. Given the foregoing, Miller breached his fiduciary duties to Camber and Miller cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

243.     For these reasons, they breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

244.     The Directors, as members of the Board, were and are subject to the Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The Code requires the Directors to also adhere to Camber's standards of business conduct. The Directors did not comply with the requirements of the Code of Conduct. The Directors violated the Code because they knowingly or recklessly engaged in and facilitated the misconduct alleged herein and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  Because the Directors violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

245.     Furthermore, demand, in this case, is excused because the Directors, who are named as defendants in this action, control the Company and are indebted to each other. The Directors have a longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand for the Directors would be futile.

246.     Camber has been and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet, the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Camber any part of the damages Camber suffered and will continue to suffer, thereby. Thus, any demand for the Directors would be futile.

247.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

248.     The acts complained of herein constitute violations of fiduciary duties owed by Camber's officers and directors, and these acts are incapable of ratification.

249.     The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Camber. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Camber, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

250.     If there is no directors' and officers' liability insurance, then the Directors will not cause Camber to sue the Individual Defendants named herein since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

251.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least four of them, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## IX.

## DIRECTOR'S ROLES IN PROXY STATEMENTS

252.     From February 19, 2019 through December 2020, the Camber board consisted of four directors: Defendant Schott, (who has been Camber "Interim CEO since May 2018); Schleizer, Zeidman and Miller. The Defendants who were directors during 2019 through the 2020 election are Schleizer, Zeidman and Schott. They were the directors who approved/authored the Proxy Statements identified herein soliciting shareholder votes and recommended that shareholders vote in favor of all proposals on the agenda.

253.     From December 2020 to the present Defendants Zeidman, Miller, Doris and Green were Camber's directors. They were the director who approved/authored the Proxy Statements identified herein soliciting shareholder votes and recommending that shareholders vote in favor of all proposals on the agenda.

## COUNT I

### Against The Individual Defendants For
### Violations Of Section 14 And  Rule 14a-4(a)(3) And (b)(1)
### (Anti-Bundling Claim)

254.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

255.     Section 14(a) provides:

> It shall be unlawful for any persons by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise in contravention of such rules and regulations as the Commission may prescribe as necessary

or appropriate in the public interest or for the protection of investors to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security registered pursuant to Section 12 of this act.

256.     SEC Rule 14a-4(a)(3) provides:

(a) The form of proxy

. . . .

(3) Shall identify clearly and impartially each matter intended to be acted upon, whether or not related to or conditioned on the approval of other matters. . . .

257.     Rule 14(b)(1) provides:

Means shall be provided in the form of proxy whereby the person solicited is afforded an opportunity to specify by boxes a choice between approval or disapprovals of, or abstention with respect to each separate matter referred to therein as intended to be acted upon, other than elections to office. (Emphasis supplied).

258.     Each of the Proxy ballots included with the January 29, 2017 Proxy, January 9, 2019 Proxy and March 3, 2020 Proxy which were provided to Plaintiff and shareholders to vote on the stock issuance and approval of the stock purchase agreements, with Discover as one proposal provide in substantially similar terms:

Approval of the issuance of such number of shares of common stock exceeding 19.99% of our outstanding common stock, issuable upon conversion of [.] shares of Series C redeemable convertible preferred stock, including shares issuable for dividends and conversion premiums thereon which can be sold pursuant to that certain stock purchase agreement entered into with an institutional investor on [. . .], and to approve [ratify] the terms of such stock purchase agreement.

259.     The 2017, 2019 and 2020 Proxies tied together separate matters in one "proposal" as a package which was presented to the stockholders for one vote thereon thus violating Rule 14a-4(a)(3) and (b)(1).

260.     As a result of the foregoing, the Proxies violated SEC regulations and votes approving the stock issuance and stock purchase agreements must be voided and/or damages awarded to Camber.

### COUNT II

**(Against Defendants For Violations Of Section 14(a) Of**
**The Exchange Act And Rule 14(a)-9 Promulgated**
**Thereunder For False And Misleading Statements In Proxy Materials)**

261.     Plaintiff incorporates by reference and realleges each and every allegation contained set forth above, as though fully set forth herein.

262.     Section 14(a)of the Exchange Act makes it "unlawful for any person, by the use of the mails  or by any means  or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 781 of this title." 15 U.S.C. § 78n(a)(1).

263.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in proxy communications that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240. 14a-9.

264.     Each of the Proxies for Annual Meeting of Shareholders issued in 2019 and 2020 were materially false and misleading.

265.     On January 31, 2020, CEI issued a Proxy Statement soliciting shareholders votes in favor of electing Schleizer, Zeidman and Miller as directors to the Company's board of directors. The Proxy statements issued to shareholder soliciting their vote in favor of electing the Individual Defendants to Cambers board concealed material details of Camber's share count and financing with Discover.

266.     The misrepresentations and omissions in the Proxy Materials were material to Plaintiff and the class members who were solicited to vote in favor of the proposals therein by defective Proxy Materials.

267.     As a result, the proposals in the Proxies were approved in violation of Section 14(a).

268.     Plaintiff seeks an order forfeiture of all shares granted thereunder to directors recommended and elected through the shareholder votes in the elections and an order rescinding the Stock Purchase Agreements or awarding damages against the Director Defendants.

269.     Defendants Schleizer and Zeidman are liable for the violations with respect to the 2017 Proxy.

270.     Defendants Schlott, Miller, Zeidman and Schleizer are liable for the violations with respect to 2019 Proxy and 2020 Proxy.

### **COUNT III**

**(Against CEI, Doris, Green, Zeidman, and Miller For Violations Of
Section 14(a) Of The Exchange Act And Rule 14(a)-9
Promulgated Thereunder For False And Misleading Statements In Proxy Materials)**

271.     Plaintiff incorporates by reference and realleges each and every allegation contained set forth above, as though fully set forth herein.

272.     Section 14(a)of the Exchange Act makes it "unlawful for any person, by the use of the mails  or by any means  or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

273.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in proxy communications that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240. 14a-9.

274.     On January 8, 2021, CEI, Doris, Green, Zeidman, and Miller issued a Proxy Statement soliciting shareholders votes in favor of increasing Camber's authorized shares of common stock from 25,000,000 to 250,000,000 through an amendment to Camber's Articles of Incorporation.

275.     The Proxy Statement soliciting the approval stated:

> We desire to authorize additional shares of common stock to ensure that enough shares will be available upon conversion of the Series C stock.

276.     The Proxy was defective and in violation of SEC Rule 14 and Rule 14a-9 because it contained untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.

277.     More specifically, the January 8, 2021, Proxy was materially false and misleading for failure to fully disclose why the additional shares were needed, when and how they would be awarded or sold, and what affect it might have on the Company's stock price.

278.     The misrepresentations and omissions in the Proxy Materials to increase the authorized shares of common stock from 25,000,000 to 250,000,000 were material to Plaintiff and the class members who were solicited to vote in favor by the defective Proxy Materials.  This constituted loss, significant dilution, and harm to their voting rights.

279.     As a result, the Proxy soliciting the approvals was in violation of Section 14(a).

280.     Plaintiff seeks an order forfeiture of all shares issued and converted thereunder and/or an award of damages.

281.     Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT IV

### Claim for Breach of Fiduciary Duty
### (Against Individual Defendants)

282.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

283.     Each Individual Defendant owed to the Company the duty to exercise candor towards shareholders, good faith, and loyalty in the management and administration of Camber's business and affairs.

284.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent

breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Camber.

285.    In breach of their fiduciary duties owed to Camber, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

286.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Camber's securities.

287.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent schemes set forth herein improperly and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained or acted with reckless disregard for the truth, in that they caused the Company to engage in the fraudulent schemes improperly and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Camber's securities.

288. Additionally, in contemplating, formulating, structuring, approving, and executing the Viking Acquisition, the Director Defendants breached their fiduciary duty of loyalty to the Company.

289. The Director Defendants also breached their fiduciary duties by entering into the Series C Convertible stock transactions with Discover Defendants and allowing the Discover Defendants to execute transactions which manipulated Camber's stock price downward thus allowing more dilution at Camber's expense for Discover's benefit.

290. The Director Defendants breached their fiduciary duties by failing to evaluate the Viking Acquisition fairly, self-dealing, approving the Viking Acquisition at an excessive and inequitable price, forgiving Viking debt, and taking on additional debt as a result of the Viking Acquisition.

291. The Director Defendants did not exercise independence in approving the financings for the Viking Acquisition, which unfairly enriched Discover Defendants, Doris, and other Viking-affiliated individuals at the expense of Camber and its public stockholders, whose shares have been diluted and devalued. As a result, the Director Defendants must, but cannot, show that the Viking Acquisition is entirely fair to Camber and its public shareholders.

292. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

293. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Camber has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. Plaintiff, on behalf of Camber, has no adequate remedy at law.

## COUNT V

### Against The Discovery Defendants For Aiding
### And Abetting The Individual Defendants' Fiduciary Breaches

294.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

295.     The Discover Defendants knew that the Individual Defendants owed fiduciary duties to Camber.

296.     The Discover Defendants conversion of Camber Series C stock into Camber common stock which was subsequently sold in the market was a manipulative scheme intended to enrich Discover at Camber's expense.

297.     The Discover Defendants knew that Camber was falsely undercounting its share count and making false reports as to the share count.

298.     The Discover Defendants knew that the SEC had put Camber on notice that its accounting for the Series C stock inversion features was incorrect and had to be corrected in subsequent SEC filings.

299.     The Discover Defendants knew that the Individual Defendants issuance of materially false and misleading SEC filings and proxy solicitations constituted fiduciary breaches.

300.     The Discover Defendants knew that the transactions between Camber and Viking in 2020 and 2021 were self-dealing transactions between Viking and Camber executive officers which constituted fiduciary breaches by the Individual Defendants.

301.     The acts of the Discover Defendants enumerated herein rendered substantial assistance to the Individual Defendants fiduciary breaches and securities law violations.

302.     As a direct result thereof, the Discover Defendants aiding and abetting of the Individual Defendants fiduciary breaches caused loss and damage to Camber.

## COUNT VI

### Claim for Waste of Corporate Assets
### (Against Individual Defendants)

303.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

304.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Camber to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in wasteful Series C financing transactions overpay for Viking's stock during the portion of the Relevant Period that at least included the period from December 2020 to June 2021.

305.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

306.     Plaintiff, on behalf of Camber, has no adequate remedy at law.

### X.

### REQUEST FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a)     For an order declaring the Viking Equity Acquisitions here not entirely fair and in a breach of the fiduciary duties of the Director Defendants, and therefore any agreement arising therefrom is unlawful and unenforceable;

b)     For an order awarding damages to Camber on each of its Counts;

c)      For an order directing that the Defendants account to Plaintiff and Camber for all damages, plus interest, caused to Camber and account for and disgorge all profits and any special benefits obtained as a result of their unlawful conduct;

d)      Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Camber;

e)      Declaring that the Discover Defendants knowingly rendered substantial assistance to the Individual Defendants' fiduciary breaches and thus aided and abetted same;

f)      Determining and awarding to Camber the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, and the Discover Defendants jointly and severally, together with pre-judgment and post-judgment interest thereon;

g)      Directing the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Camber and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder certain resolutions for amendments to the Company's Bylaws or Articles of Incorporation as may be necessary to ensure proper corporate governance policies;

h)      Awarding Camber restitution from the Discover Defendants Individual Defendants;

i)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

j)      Granting such other and further relief as the Court may deem just and proper.

## XI.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated: June 30, 2022                          Respectfully Submitted,

                                              **KILGORE & KILGORE, PLLC**

                              By:             */s/  Clark B. Will*
                                              Clark B. Will
                                              Texas Bar No. 21502500
                                              THE LAW OFFICE OF CLARK B. WILL, P.C.
                                              Member of the Firm
                                              3141 Hood Street, Suite 500
                                              Dallas, TX 75219
                                              Telephone: (214) 379-0834
                                              Facsimile:  (214) 379-0838
                                              E-mail:  cbw@kilgorelaw.com


                                              **OF COUNSEL:**

                                              **SQUITIERI & FEARON, LLP**
                                              Lee Squitieri
                                              NY Bar No.  1926633
                                              305 Broadway, 7th Floor
                                              New York, New York 10007
                                              Telephone:  (212) 421-6492
                                              Facsimile:  (212) 421-6553
                                              Email: lee@sfclasslaw.com

                                              **MOORE KUEHN, PLLC**
                                              Fletcher Moore
                                              NY Bar No. 4912945
                                              Justin Kuehn
                                              NY Bar No. 4588794
                                              30 Wall Street, 8th Floor
                                              New York, New York 10005
                                              Telephone:  (212) 709-8245
                                              Facsimile:  (917) 634-3035
                                              Email: fmoore@moorekuehn.com
                                              Email:  jkuehn@moorekuehn.com

                                              Pro Hac Vice Applications Pending
                                              Submission

                                              **ATTORNEYS FOR PLAINTIFF
                                              ROBERT HOWIE, DERIVATIVELY
                                              ON BEHALF OF CAMBER ENERGY
                                              INC.**

---

## VERIFICATION

I, ROBERT HOWIE, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Camber Energy Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this ___RH___ day of June 2022.

_Rob Howie_
Bob Howie (Jun 23, 2022 10:21 CDT)

ROBERT HOWIE

# Camber Energy Complaint Verification

Final Audit Report                                                                 2022-06-23

| | |
|---|---|
| Created: | 2022-06-22 |
| By: | Justin Kuehn (jkuehn@moorekuehn.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAidYC8v16xlib0kMyBPWoL4PnarnEC3lh |

## "Camber Energy Complaint Verification" History

Document created by Justin Kuehn (jkuehn@moorekuehn.com)
2022-06-22 - 3:35:49 PM GMT- IP address: 24.188.39.187

Document emailed to rob@polarismedicalmanagement.com for signature
2022-06-22 - 3:36:06 PM GMT

Email viewed by rob@polarismedicalmanagement.com
2022-06-22 - 4:52:34 PM GMT- IP address: 172.58.102.155

Document e-signed by Rob Howie (rob@polarismedicalmanagement.com)
Signature Date: 2022-06-23 - 9:21:00 PM GMT - Time Source: server- IP address: 47.184.198.169

Agreement completed.
2022-06-23 - 9:21:00 PM GMT

Adobe Acrobat Sign